**SLIP-OP. 00 -8**

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**HONORABLE JAMES L. WATSON, SENIOR JUDGE**

-------------------------------------------------X

**HOOGOVENS STAAL BV, ET AL., )**       CONSOL. CT. NO. 98-04-00926

       **Plaintiffs,** )

    **v.** )

           )

**UNITED STATES,** )
      **Defendant.**
          )
---------------------------------------------- X

[Plaintiffs HOOGOVENS, a foreign steel producer and its affiliated U.S. importer, move for judgment on the agency record contesting Commerce's level of trade determination in its Final Results of the third administrative review of the antidumping duty order on certain steel products from The Netherlands. The Final Results are remanded to Commerce for clarification of the evidentiary basis for its determination that Hoogovens' sales were made at two levels of trade, Commerce's alleged use of facts otherwise available and adverse inferences pursuant to 19 U.S.C. § 1677e(a) and (b), and explication of Commerce's compliance, if any, with § 1677m(d).

Domestic steel industry plaintiffs move for judgment upon the agency record contesting Commerce' determination in its Final Results not to apply its reimbursement regulation, 19 C.F.R.§ 353.26(a), in calculating Hoogovens' margins of dumping, and Commerce's treatment of Hoogovens' home market warranty and technical service expenses as direct expenses. Commerce 's reimbursement determination is supported by substantial evidence on the record and is affirmed. The Final Results are remanded to Commerce to reconsider its treatment of warranty and technical service expenses.]

   Dated: January 21, 2000

Powell, Goldstein, Frazer & Murphy, LLP (Peter 0. Suchman, David J. Sullivan, and Niall P. Meagher, Esqs.) for plaintiffs Hoogovens Staal BV and Hoogovens Steel USA, Inc.

Skadden, Arps, Slate, Meagher & Flom LLP (Robert. Lighthizer and John J. Mangan, Esqs.) for plaintiffs U.S. Steel Group A Unit of USX Corporation, Bethlehem Steel Corporation, Inland Steel Industries, Inc., LTV Steel Company, Inc. and National Steel Corporation.

David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director, Commercial
Litigation Branch, Civil Division, United States Department of Justice (Katherine A. Barski, Attorney);
David R. Mason, Jr. , Attorney Advisor, Office of Chief  Counsel, United States Department of
Commerce, of counsel, for defendant.

**OPINION AND ORDER**

**WATSON, SENIOR JUDGE:**

**INTRODUCTION**

Plaintiffs[1]  move for judgment upon the agency record pursuant to Rule 56.2 of the rules of the

United States Court of International Trade challenging certain determinations made in the final results of

the third annual administrative review by the International Trade Administration, United States

Department of Commerce ("Commerce") of the antidumping duty order covering certain cold-rolled

carbon steel flat products from the Netherlands.[2] Certain Cold-Rolled Carbon Steel Flat Products From

the Netherlands: Final Results of Antidumping Duty Administrative Review, 63 Fed. Reg. 13,204

(Dep't. of Commerce, March 18, 1998) ("Final Results"), for the period of August 1, 1995 through July

31, 1996 (the "POR").[3] Commerce initiated the third administrative review on September 17, 1996.

Initiation of Antidumping and Countervailing Duty Administrative Reviews, 61 Fed. Reg. 48,882 (Dep't

---

[1] Domestic steel industry plaintiffs are: U.S. Steel Group, A Unit of USX Corporation;
Bethlehem Steel Corporation; Inland Steel Industries, Inc.; LTV Steel Company, Inc.; and National
Steel Corp. (collectively, "domestic steel producers"). Hoogovens Staal BV is a Netherlands steel
producer and Hoogovens Steel USA, Inc. is an affiliated U.S. importer (collectively, "Hoogovens").

[2] Antidumping Duty Order: Certain Cold-Rolled Carbon Steel Flat Products From the
Netherlands, 58 Fed. Reg. 44172 (Dep't of Commerce, August 19, 1993).

[3] Commerce had previously conducted administrative reviews covering the periods 1993/94
and 1994/95.

of Commerce, Sept. 17, 1996).[4] Commerce published the preliminary results of the third administrative

review on September 9, 1997, <u>Certain Cold-Rolled Carbon Steel Flat Products from the Netherlands:</u>

<u>Preliminary Results of Antidumping Duty Administrative Review</u>, 62 Fed. Reg. 47,418 (Dep't of

Commerce, September 9, 1997). The administrative review was conducted under the provisions of

section 751(a)(1) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675(a)(1), and the court's

jurisdiction  is predicated on 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c).

**PARTIES' CONTENTIONS**

HOOGOVENS contend: (1)  since it did not claim any level of trade adjustment, Commerce

acted contrary to law in placing a burden of proof on Hoogovens to demonstrate that its sales were not

made at two levels of trade in the home market and export market; (2) Hoogovens' information

submitted in response  to Commerce's questionnaires was complete, detailed, and responsive, and all

evidence of record shows sales were made at one level of trade; (3) since Hoogovens fully responded

and provided detailed information to Commerce's questionnaires and otherwise fully cooperated,

Commerce inappropriately used facts available and adverse inferences pursuant to 19 U.S.C. §

1677e(a) and (b) in determining that sales were made at two levels of trade; (4) Commerce failed to

give Hoogovens prompt notice of any inadequacy or deficiency in the responses and give Hoogovens an

opportunity to remedy deficiencies, in violation of § 1677m(d); (5) Commerce's determination that there

was no reimbursement of antidumping duties and that warranty and technical service expenses in the

---

[4] Because the third review was initiated after January 1, 1995, the applicable antidumping law and regulations are those in effect following the changes in law by the Uruguay Round Amendments Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) (the "URAA"). <u>See</u> URAA § 291(a)(2), (b); <u>NSK LTD. v. Nippon Pillow Block Sales Co., Ltd.</u>, 190 F.3d 1321, 1325 (Federal Circuit, September 2, 1999), citing <u>Cemex, S.A. v. United States</u>, 133 F.3d 897, 899 n. 1 (Fed. Cir. 1998).

home market were properly treated as direct are supported by substantial evidence on the record.

Domestic steel producers claim: (1) Commerce's determination there was no reimbursement of antidumping duty assessments and failure to apply its reimbursement regulation, 19 C.F.R. § 353.26(a), is unsupported by substantial evidence on the record and contrary to law since the evidence of record shows financial intermingling directly linked to reimbursement; (2) Commerce treatment of  Hoogovens' unsegregated direct and indirect warranty and technical service expenses in the home market as all direct is contrary to law; (3) Hoogoven's information, including that submitted in the second administrative review,  establishes two levels of trade, and Commerce's level of trade determination is supported by substantial evidence on the record and is in accordance with law; (4) Commerce properly resorted to facts otherwise available in compliance with 19 U.S.C. § §1677e(a) and 1677m(d).

Defendant contends: (1)  Hoogovens' failed to sustain its burden of proof that its home market and U.S. sales were made at the same level of trade; (2) Commerce's determination that sales were made at two levels of trade is supported by substantial evidence on the record; (3) Commerce's determination that Hoogovens' sales were made at two levels of trade is based, in whole or in part, on facts otherwise available pursuant to § 1677e(a), but not on adverse inference pursuant to § 1677e(b); (4) Commerce's determinations that the U.S. importer's restructuring did not involve financial intermingling linked to reimbursement of antidumping duties and that the reimbursement regulation should not be applied to Hoogovens is supported by substantial evidence on the record and is in accordance with law; (5) Commerce may have erred in its treatment of warranty and technical service expenses in the home market as all direct, and therefore, the case should be remanded for reconsideration of such expenses.

## REIMBURSEMENT OF ANTIDUMPING DUTIES

In its Final Results Commerce determined that Hoogovens had overcome a rebuttable presumption that it was continuing to reimburse the affiliated U.S. importer for assessments of antidumping duties.[5] Domestic steel producers, however, insist that since the evidence of record establishes the financial  restructuring of the importer constituted nothing more than a post hoc attempt by Hoogovens to avoid the application of the reimbursement regulation and involved financial intermingling linked to reimbursement, Commerce's reimbursement determination is unsupported by substantial evidence on the record and otherwise contrary to law.

For the following reasons, the court sustains  Commerce's reimbursement determination.

---

[5]During the third administrative review,  Commerce issued the following proposed statement of policy concerning rebuttable presumptions of reimbursement of antidumping duty assessments: "[Commerce] continues to presume that exporters and producers do not reimburse importers for antidumping duties, absent direct evidence of such activity. However, where [Commerce] determines in the final results of an administrative review that an exporter or producer has engaged in the practice of reimbursing the importer, [Commerce] will presume that the company has continued to engage in such activity in subsequent reviews, absent a demonstration to the contrary. Accordingly, if the producer or exporter claims that the reimbursement situation no longer exists, such producer or exporter must satisfy [Commerce] that (1) the importer is solely responsible for the payment of the antidumping duty, and (2) either (a) the importer was, and continues to be, financially able to pay the antidumping duties, or (b) a corporate event, such as a corporate restructuring or a capital infusion, enabled the importer to generate enough income to pay such duty." Final Results at 13213 (citing to December 18, 1997 Supplemental Questionnaire, Conf. Doc. 44, at 1).

The domestic producers opposed the policy insofar as the reimbursement regulation would not be applied when a corporate event, such as a capital infusion, "enabled the importer to generate sufficient income to pay" antidumping duties. Petitioners' Comments on Hoogoven's Supplemental Questionnaire Response (Jan. 30, 1998), Pub. Doc. 102 at 9. See Inland Steel Industries, Inc. v. United States, 188 F. 3d 1349 (Fed. Cir. August 24, 1999 (validity of agency presumptions are subject to judicial review).

Because Commerce found in the first administrative view that Hoogovens reimbursed its U.S. affiliate for antidumping duties, following its new policy guidelines in the third review, Commerce presumed that the earlier reimbursement activity continued, thus putting the burden of proof on Hoogovens and its U.S. affiliate to demonstrate the absence of reimbursement activity during the POR.

Commerce's  reimbursement regulation, 19 C.F.R. § 353.26(a),  provides, so far as pertinent, that Commerce will deduct from United States price the amount of any antidumping duty that the producer or reseller (1) paid directly on behalf of the importer, or (2) reimbursed to the importer. The application of the regulation effectively increases the margin of dumping, and hence the amount of antidumping duties assessed, by the amount of any reimbursement of antidumping duties. See  Color Television Receivers from the Republic of Korea: Final Results of Antidumping Duty Administrative Review, 61 Fed. Reg. 4408, 4410 (Dep't of Commerce, 1996) ("In effect, antidumping duties raise prices of the subject merchandise to importers, thereby providing a level playing field upon which injured United States industries can compete. The remedial effect of the law is defeated, however, where exporters themselves pay antidumping duties, or reimburse importers for such duties"). See also Torrington Co. v. United States, 127 F.3d 1077, 1080-81 (1997).

The objective of the reimbursement regulation is to ensure that the remedial purpose of the antidumping law is not compromised by the payment or reimbursement of antidumping duties by the foreign producer and exporter that would in effect relieve the importer of the financial consequences of dumping.  In Hoogovens Staal BV v. United States, 4 F. Supp. 2d 1213, 1217 (CIT 1998), the court addressed the purpose of the reimbursement regulation:

> If the exporter assumes the cost of antidumping duties, an importer could continue to import at the lower, dumped price. U.S. producers would remain at a competitive disadvantage without the benefit of a viable remedy for the injury caused by the dumped imports. The regulation preserves the statutory remedy by accounting for the amount of duties reimbursed or paid by the exporter so that the final assessed duty will remedy the injury. Presumably, an exporter will be reluctant to continue paying the cost of antidumping duties because the margin will increase accordingly each time Commerce reviews it. Thus, the effect

of the [antidumping] order on import prices will be preserved.

Domestic steel producer plaintiffs contend that in accordance with its established practice to apply the reimbursement regulation to affiliated parties where the record shows "financial intermingling linked to reimbursement," Commerce should have applied the regulation to Hoogovens since the record of this review establishes that the capital restructuring of the U.S. affiliate involved such financial intermingling. Defendant and Hoogovens, however, argue that the facts of record demonstrate that in the restructuring there was no financial intermingling linked to reimbursement of antidumping duties within the POR.

The court finds that Commerce's reimbursement determination is supported by substantial evidence on the record and is not contrary to law.

In its first administrative review, covering the period of August 18, 1993 through July 31, 1994, Commerce determined that pursuant to an agreement between the parties, Hoogovens reimbursed its affiliated importer for antidumping duties, 61 Fed. Reg. 48,465 (Sept. 13, 1996), and accordingly, Commerce deducted antidumping duties from United States price pursuant to  the regulation, 19 C.F.R. § 353.26; 61 Fed. Reg. at 48,470. In Hoogovens Staal BV  v. United States, supra,  the final results of the first administrative review were affirmed.

However, in the second administrative review, Commerce found Hoogovens was no longer reimbursing its affiliated importer for payment of antidumping duties, and therefore, Commerce did not find reimbursement had occurred during  that period of review. 62 Fed. Reg. 18,476, 18,477-78 (Dep't of Commerce, April 15, 1997).  In Bethlehem Steel Corp. v. United States, 27 F. Supp. 2d 201, 207-08 (CIT 1998), Commerce's determination there was no reimbursement of antidumping duties was

sustained by the court based on evidence that: (1) Hoogovens and its affiliated importer had revised their agency agreement, thereby making the importer solely responsible for paying any antidumping duties to be assessed; (2) the importer had begun refunding to the producer antidumping duty cash deposits previously advanced.

As indicated above, in the <u>Final Results</u> of the third review, after applying a rebuttable presumption of reimbursement and putting the burden of proof on Hoogovens, Commerce determined that on the basis of the facts of record no reimbursement for antidumping duties occurred during the POR. Commerce examined the corporate restructuring in Hoogovens' United States operations and found that the U.S. affiliate had "the financial ability [on its own] to generate sufficient income to pay antidumping duties to be assessed." <u>Final Results</u> at 13215. Commerce states:

> We agree with petitioners that, under certain circumstances, the corporate event, such as a capital infusion, may be the very means of reimbursing the importer. The Department's policy is crafted to address the instances in which there has been a finding of reimbursement and the importer is financially unable to pay the duty on its own. In that circumstance, the Department will determine that the importer must continue to rely on reimbursements, such as intracorporate transfers, from the producer or exporter in order to meet its obligation to pay the duties. However, where a corporate event, such as restructuring, has occurred, the importer must demonstrate that this event provides a continuing source of income to the importer such that the importer is able to pay the antidumping duty on its own (i.e., based upon the importer's total income). In contrast, a capital infusion that is used to pay antidumping duties directly would constitute further reimbursement of antidumping duties. In such a case, the Department will deduct the amount of the reimbursement from U.S. price in calculating the dumping margin.

Final Results at 13214.

In the Final Results Commerce concluded from the amended agreement of December 18, 1996 between Hoogovens and its U.S. affiliate (Commerce Reimbursement Memorandum of August 29, 1997, Conf. Doc. 34, at 2 ), and other evidence on the record that "Hoogovens has met its burden of establishing that its affiliated importer, HSUSA, (1) is solely responsible for the payment of the antidumping duties in this review; and (2) has the financial ability to generate sufficient income to pay the antidumping duties to be assessed." Final Results at 13215. Commerce also found that there was no longer any agreement to reimburse the affiliated importer for antidumping duties to be assessed, that the U.S. affiliate refunded to Hoogovens the sums advanced for the payment of cash deposits for antidumping duties, and that the importer is generating sufficient income to pay the duties on its own. Therefore, based on the foregoing facts of record, Commerce determined that no reimbursement existed. Final Results at 13215.

As noted above, in Bethlehem, Steel, 27 F. Supp. 2d at 207, the court held that the provisions of the revised agency agreement which eliminated reimbursement of antidumping duties, and the refund of cash deposits for antidumping duties constituted substantial evidence to support Commerce's determination not to apply the reimbursement regulation in the second administrative review. On the basis of the administrative record in the third review, no different conclusion is warranted here since there is no evidence related to the restructuring that shows a concrete link between any of the restructuring events or transactions and reimbursement of antidumping duties. See Torrington Co. v. United States, 127 F.3d at 1077 (application of the reimbursement regulation requires the showing of "some concrete link" between particular intracorporate transfers and payment of antidumping duties).

Commerce's factual predicates, as set forth in the Final Results, for its determination there was no reimbursement of antidumping duties during the POR are consistent with a finding of no financial intermingling linked to reimbursement.

The court will uphold Commerce's determination unless it is found "unsupported by substantial evidence on the record, or otherwise not in accordance with law." The Thai Pineapple Public Co., Ltd. v. United States, 187 F.3d 1362, 1365 (Fed. Cir. July 28, 1999) (citing Micron Technology, Inc. v. United States, 117 F. 3d 1386, 1393 (Fed. Cir. 1997) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). "Substantial evidence" is "more than a mere scintilla and such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence." Atlantic Sugar Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984). The Supreme Court has stated that "substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "Substantial evidence" has also been defined as evidence "which could reasonably lead to [Commerce's] conclusion," so that the conclusion can be described as a "rational decision." Matsushita Elec. Indus. Co., Ltd. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984).

Additionally, in reviewing agency determinations the court declines to reweigh or reinterpret the evidence of record. See Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (noting that the substantial evidence standard "frees the reviewing courts of the time-consuming and difficult task of weighing the evidence, it gives proper respect to the expertise of the administrative tribunal and it helps

promote the uniform application of the statute"). It is not the province of this court to review the record

evidence to determine whether a different conclusion could be reached, but to determine whether

Commerce's determination is supported by substantial evidence.  See Inland Steel Industries, Inc. v.

United States, 188 F.3d 1349, 1359 (Fed. Cir. August 24, 1999), citing P.P.G. Indus., Inc. v. United

States, 978 F.2d 1232, 1236 (Fed. Cir.1992). See also Consolo, 383 U.S. at 620 ("the possibility of

drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's

finding from being supported by substantial evidence").

Domestic steel industry producers contend that Commerce ignored record evidence of

financial intermingling linked to reimbursement.  Commerce, however, closely examined the events and

circumstances surrounding the corporate restructuring of Hoogovens' U.S. affiliate and concluded there

was nothing of record to suggest that there was a reimbursement of antidumping duties. Investigations

of corporate restructurings and other corporate events for purposes of the antidumping laws involve

inquiries into complex economic, accounting and financial matters in which Commerce has particular

expertise, and Commerce's determinations in such matters are entitled to deference. See The Thai

Pineapple Public Co., Ltd., 187 F.3d at 1365. That plaintiff can point to evidence . . . which detracts

from . . . [Commerce's] decision and can hypothesize a . . . basis for a contrary determination is neither

surprising nor persuasive." Matsushita Elec. Indus. Co., 750 F.2d at 936.  See also United States Steel

Group v. United States, 96 F.3d 1352, 1357 (Fed. Cir.  1996) (Agency determinations must be

sustained if reasonable, whether or not the court would have come to the same conclusion in reviewing

the evidence in the first instance); P.P.G. Industries, 978 F.2d at 1237 (quoting  Consolo v. Fed.

Maritime Comm'n, 383 U.S. 607, 619-20 (1965)) ("[T]he possibility of drawing two inconsistent

conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992) (court should not supplant agency's findings that are supported by substantial evidence merely by identifying alternative findings supported by substantial evidence). See also The Thai Pineapple Public Co., Ltd., 187 F.3d at 1365 (citing Fijitsu General Ltd. v. United States, 88 F. 3d 1034, 1044 (Fed. Cir. 1996).

There is no statute governing how Commerce must address reimbursement of antidumping duties, but as previously noted, Commerce promulgated a reimbursement regulation, 19 C.F.R. § 353.26. The regulation, however, does not specifically address corporate restructuring or capital infusions. In furtherance of implementing its reimbursement regulation, Commerce issued the statement of policy discussed supra at footnote five.   As noted therein, domestic producers disagree with Commerce that its reimbursement regulation should not be applied when a corporate event, such as a capital infusion, "enabled the importer to generate sufficient income to pay" antidumping duties. Statement of Policy, see n.5, supra.

As the Supreme Court instructed in its landmark decision, Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 842-43 (1984), where "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. However, in the absence of clear legislative guidance, the reviewing court must defer to the Department's reasonable legal interpretations." See also NSK Ltd. v. Koyo Seiko Co., Ltd., 190 F.3d 1321 (Federal Circuit September 2, 1999), citing Timex V.I., Inc. v. United States, 157 F. 3d 879, 881-82 (Fed. Cir. 1998); The Thai Pineapple Public Co., Ltd., 187 F. 3d at 1365; British Steel PLC v. United States, 127 F.3d 1471, 1475 (Fed. Cir. 1997;  Torrington Co. v.

United States, 82 F. 3d 1039, 1044 (Fed. Cir. 1996); Koyo Seiko v. United States, 36 F. 3d 1565,

1573 (Fed. Cir. 1994); Daewoo Elec. Co. v. International Union, 6 F. 3d 1511, 1516 (Fed. Cir.

1993), cert. denied, 512 U.S. 1204 (1994).

In the Final Results, Commerce found that "the facts and circumstances surrounding the

corporate restructuring are clear and consistent with the purposes of the [reimbursement] regulation. Id.

at 13214. Fundamentally, of course, substantial deference must be given to an agency's interpretation of

its own regulations that implement a statute that it administers. "[S]ubstantial deference [is owed] to

Commerce's interpretations of is own regulations." NSK Ltd., 190 F.3d at 1326 (citing Torrington Co.

v. United States, 156 F. 3d 1361, 1363-64 (Fed. Cir. 1998).  As the court observed in Torrington:

"[T]he agency's interpretation must be given controlling weight unless it is plainly erroneous or

inconsistent with the regulation . . . This broad deference is all the more warranted when, as here, the

regulation concerns a complex and highly technical regulatory program, in which the identification and

classification of relevant criteria necessarily require significant expertise and entail the exercise of

judgment grounded in policy concerns." (Emphasis added.) With respect to the application of the

reimbursement regulation to corporate restructuring activities, the foregoing quotation from Torrington is

especially in point. See also Torrington, 127 F. 3d at 1080 (citing Thomas Jefferson Univ. v. Shalala,

512 U.S.  509, 512 (1994)); Asociacion Colombiana de Exportadores de flores  v. United States, 903

F. 2d 1555, 1559 (Fed. Cir. 1990) ("When the construction of an administrative regulation rather than

a statute is in issue, deference is even more clearly in order").

Domestic steel industry producers contend that Hoogovens engaged in restructuring intended

solely to avoid the application of the reimbursement regulation and has failed to provide any other

rationale for the restructuring; and that a  restructuring intended to provide the importer with continuing financial ability to generate income to pay antidumping duties on its own is an unlawful circumvention of the regulation. The court must reject as a totally unsound concept that avoidance of  the application of the reimbursement regulation in the manner alluded to by domestic steel industry plaintiffs should itself be a basis for applying the regulation.

As aptly pointed out by the Government, adoption of the domestic steel producers' position would mean in effect that a financial restructuring intended by the parties to avoid the need for future reimbursements would itself be a self-defeating "reimbursement."  According to the Government, "[t]he reimbursement regulation was not intended to lock importers into successive reimbursement findings, regardless of any ameliorative steps [including restructuring] importers may take." Deft's Mem. in Partial Opp. to Pltf' s Motions at 32. Moreover, the court must agree with defendant that to interpret the regulation in the manner insisted upon by domestic producers  would require Commerce to parse all corporate restructurings and other such events, which businesses engage in for various and sundry reasons, to determine whether or not (or to what extent) an intent to provide the importer with financial ability to pay antidumping duty assessments on its own was  a  motivation for the restructurings, which would be extremely  burdensome at best, and perhaps impractical.

Commerce's reimbursement determination is supported by substantial evidence on the record and is not contrary to law. Therefore, the determination is sustained.

## LEVEL OF  TRADE

## I.

## BURDEN OF PROOF

Pursuant to 19 U.S.C. § 1677b(a)(7), Commerce makes comparisons of normal value and export price at the same levels of trade; normal value may be increased or decreased  to make allowance for any differences between the export price and normal value that is wholly or partly due to a difference in the levels of trade in the two markets.

Commerce determined that Hoogovens  failed to sustain its burden of proving its claim that all sales were made at one level of trade, and that the sales to its end-user and service center customers were made at two different levels of trade.

At issue here is Hoogovens' contention  that all sales in the home market and for export to the United States (export price sales) to its two customer groups - - end-users and steel service centers - - were made at a single level of trade and, therefore, no level of trade adjustments are necessary.

Hoogovens does not dispute that it was required to fully comply with Commerce's requests for information, but vigorously disagrees with Commerce that it had any  "burden of proof" to show there was not two levels of trade. Rather, according to Hoogovens,  a respondent who does not claim any adjustment for different levels of trade need not prove a negative, i.e., that different levels of trade do not exist, and therefore, adjustments for different levels of trade are not required. In essence, then, Hoogovens maintains that since it  made no claim to Commerce for any adjustments for different levels of trade, Commerce should simply have automatically calculated the margin of dumping without level of trade adjustments on the basis that all sales in the home market and for export were made at a  single level of trade. Commerce posits that whether or not a respondent sustains its burden of proof, the agency has the responsibility for determining what levels of trade exist.

Hoogovens directs the court's attention to the Statement of Administrative Action

accompanying the URAA, H. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess. (1994) ("SAA"), as

authority that absent any claim for adjustments for differences in levels of trade, a respondent bears no

burden of proof as to what levels of trade exist. Interestingly, in support of the contrary conclusion,

Commerce's rationale in the Final Results for placing the burden of proof on Hoogovens is also

predicted on the very same SAA. Thus, Commerce explains:

> Under the URAA, a level of trade adjustment can increase or decrease
> normal value. SAA at 159. Accordingly, the SSA directs Commerce to
> "require evidence from the foreign producers that the functions
> performed by the sellers at the same level of trade in the U.S. and
> foreign markets are similar, and that different selling activities are
> actually performed at the allegedly different levels of trade." Id. * * *
> Thus, to properly establish the LOT of the relevant sales, Commerce
> specifically requests LOT information in every antidumping proceeding
> conducted under the URAA, regardless of whether a respondent sells
> solely to one nominal customer category, such as service centers or
> end-users. Moreover, consistent with that approach, we note that of
> necessity, the burden is on a respondent to demonstrate that its
> categorizations of LOT are correct.  Respondent must do so by
> demonstrating that selling functions for sales at allegedly the same level
> are substantially the same * * *.

> As a matter of policy, the Department cannot allow
> respondents to form their own conclusions on LOT [i.e., all sales are
> made at one level of trade] and then submit [only] the data to support
> their conclusions. Rather, it is the Department's responsibility, not
> respondent's to determine LOTs. It is not that respondents have the
> burden to "prove the negative," as Hoogovens states, but that
> respondents have a burden to demonstrate that there is only one LOT.
> We make no presumption as to the number of LOTs in a market.
> Rather, the respondent must provide information which satisfactorily
> demonstrates what LOTs exist. Respondent's failure in this case to
> provide detailed LOT information leads the Department to conclude
> that it has not met its burden of proof to demonstrate that there is in fact
> only one LOT, particularly in light of other evidence indicating the
> existence of two LOTs.

Final Results at 13206-07 (emphasis added). The court finds that Commerce's position is not contrary to law.

Commerce's determination with respect to levels of trade can significantly affect the calculation of the margin of dumping and thereby the amount of dumping duties assessed and cash deposits required. A respondent who, as here,  seeks to minimize the margin of dumping by claiming that all sales were made at one level of trade, and  vigorously pursues its claim in furtherance of that objective, presumably possesses the relevant level of trade information, and of necessity, must bear the burden to come forward with the necessary evidence to establish its claim. Nonetheless, as pointed out by Commerce, whether or not a respondent meets its burden of production or proves its claim, it is the agency's responsibility, not that of respondent, to determine what levels of trade exist. Id. at 13207. If, for whatever reason, respondent fails to submit all the requested information, Commerce must nevertheless proceed in its investigation with the evidence available to determine what levels of trade exist. In this case, Commerce determined that Hoogovens' had failed to submit the information required to sustain its burden of proof as to one level of trade, and determined that sales were made in both markets at two levels of trade.

**II.**

**COMMERCE'S  FINAL RESULTS REQUIRE CLARIFICATION AS TO WHETHER ITS LEVEL OF TRADE DETERMINATION IS BASED ON EVIDENCE OF RECORD OR ON FACTS AVAILABLE IN ACCORDANCE WITH 19 U.S.C.  § 1677e(a) and § 1677m(d).**

Defendant and the domestic steel producers argue that Hoogovens failed to provide full information, failed to adequately respond to the questionnaires and supplemental questionnaires,

Hoogovens provided Commerce with contradictory information, and that since Hoogoven's responses were deficient and it was uncooperative, Commerce properly resorted to facts otherwise available pursuant to 19 U.S.C. § 1677e(a)(1) and (2) in compliance with § 1677m(d).

The evidence of record shows that Commerce requested information from Hoogovens through an original and two sets of supplemental questionnaires endeavoring to obtain sufficiently detailed information concerning Hoogovens' selling functions, channels of trade, etc. with respect to the two customer categories to whom Hoogovens made sales in the home market and for export to the United States - - service centers and end-users. The initial questionnaire requested information concerning, inter alia, specific differences and similarities in selling functions and/or support services in the home market and the United States  related to each of its customer groups and how differences affected price comparability. Hoogovens responded that it "has determined that it cannot differentiate among the selling functions performed and services offered to different classes of home market or export price customers," Hoogovens' Section A Response at 17, P.R. 17.

Hoogovens continued to insist in its responses to the supplemental questionnaires that with respect to its two customer categories Hoogovens could not distinguish levels of trade for its export price and home market sales based on the selling functions performed by Hoogovens in connection with those sales, that all of its home market and export price sales used the same channels of distribution, that prices charged in each market did not vary depending upon the channel of distribution, and therefore, that all sales were made at the same level of trade in both markets.

Interestingly, Commerce preliminarily accepted Hoogovens' submissions ostensibly as adequate responses, and initially determined there was one level of trade for all of Hoogovens' sales.

However, the preliminary determination, which agreed with Hoogovens claim, was strenuously objected to by the petitioners (domestic steel producers in this case ) on the basis of certain information Hoogovens had submitted in the third review, which allegedly was contradictory to information submitted by Hoogovens to Commerce  in the second administrative review. Petitioners insisted that Hoogovens' information demonstrated there were two levels of trade in each market.

Specifically, in the third review domestic steel industry plaintiffs pointed to the fact that in the second administrative review Hoogovens initially claimed that it provided "much greater sales support" to its end-user customers than to its service center customers, indicative of different levels of trade, but subsequently reversed its position to claim there was only a single level of trade. Notwithstanding the foregoing circumstances,  in the final results of the second review (and in the preliminary results of the third review, 62 Fed. Reg. at 47421) Commerce accepted Hoogovens' claim there was a single level of trade.

However, following the preliminary results of the third review, and at the urging of the domestic steel producers, Commerce specifically asked Hoogovens to address the functions that it had previously identified in the second review  indicative of different levels of trade, Commerce's Supplemental Questionnaire for Hoogovens (December 13, 1996) at 1. However,  notwithstanding the seemingly contradictory information submitted by Hoogovens in the second review focused on by the domestic steel producers in the third review,  Hoogovens continued to insist in the third review that it could not differentiate between levels of trade based on selling functions performed by Hoogovens with respect to its end-user and service center categories of customers.

In its  Final Results at 13207, Commerce stated:

Respondent's failure in this case to provide detailed LOT [level of trade] information leads the Department to conclude that it has not met its burden of proof to demonstrate that there is in fact only one LOT, <u>particularly in light of other information indicating the existence of two LOTs.</u>

*     *     *     *

In the present case, Hoogovens sold to end-users and service centers in both the U.S. and home markets. <u>It is undisputed that these transactions constitute sales through different channels of trade.</u>

       With respect to the selling functions performed, we conducted a comprehensive examination of the available information provided by Hoogovens in this case. The Department requested information on selling functions in the original questionnaire and two supplemental questionnaires. <u>Based upon the information submitted on the record, we are unable to determine conclusively whether the specific selling functions performed by Hoogovens with respect to sales to the service centers and end-users reflect sales at the same LOT.</u>

*     *     *     *

       The statements and evidence Hoogovens has elected to place <u>on the record</u> indicate an ability to isolate data on selling functions and determine how they vary in kind and degree by customer category or end-use. <u>Despite that apparent ability, Hoogovens declined to provide all of the detailed information which the Department requested for purposes of conducting a LOT analysis.</u> As noted above, respondent's failure to provide detailed LOT information has left the Department with <u>an inadequate record on this issue [of selling functions].</u> For example, the Department specifically requested that Hoogovens "describe in detail the nature and extent of the selling functions performed." * * * The Department required that "[f]or each selling function, describe in detail whether it is performed to a greater degree, or in a different manner, depending on customer type." <u>Id.</u> <u>By its own admission, Hoogovens performed varying levels of technical and quality assurance assistance. Nevertheless, Hoogovens did not provide the information necessary for the Department to make a proper evaluation of LOT and assess the assertions made by Hoogovens.</u> Because Hoogovens has not provided an adequate explanation of the services it performs, nor demonstrated that variations in services supplied are not related to customer category, <u>the Department is unable to assess the validity of Hoogovens' claim that it performs the same services for all customers in all markets.</u>

Furthermore, <u>other evidence on the record suggests that there are different selling functions performed based on the customer category</u> in this case. * * *

               *        *        *        *

Further, Hoogovens' responses appear contradictory. * * *

               *        *        *        *

In sum, the <u>evidence on the record</u> demonstrates that, both in the home market and in the United States, sales occur at two different stages in the marketing process and to two different customer categories ( i.e., service centers and end-users). Significantly, in this case, the Department has also determined that a pattern of consistent price differences exists with respect to sales occurring at these two different stages of marketing in the home country. In fact, <u>Hoogovens has acknowledged</u> that one primary factor governing prices charged to end-users and service centers is the "historic commercial reasons related to the relative functions of service centers and end-users. <u>Therefore, on the basis of facts available we are treating EP and home market sales to end-users as a different LOT than home market sales to service centers.</u> Further, since the basis for distinguishing LOT is the provision of technical and warranty services, and the LOT of the CEP sales is the LOT of the affiliated service centers, we are treating all CEP sales as sales to service centers and this LOT as equivalent to the home service center LOT.

<u>Id.</u> 13208 (emphasis added).

The <u>Final Results</u> are clear that Commerce found the evidence of record  inadequate to sustain Hoogovens' claim all sales were made at <u>one level</u> of trade. Notwithstanding Hoogovens' failure to submit adequate evidence to sustain its claim with respect to a single level of trade, the court agrees with Commerce that it still had the responsibility to determine what levels of trade existed.  Both defendant and domestic steel producers strenuously argue that in determining there were two levels of trade,  Commerce pointed to substantial evidence of record there were two levels of trade, and also to "facts available." It is unclear, however,  whether Commerce predicates its determination there were two levels of trade solely on all the available facts <u>of record</u>, or whether Commerce resorted, in whole or in part,  to other facts available (not of record) pursuant § 1677e(a)(1) or (2). While, of course,  it is

arguable that Commerce may have resorted to facts otherwise available pursuant to the statute,

significantly, the statutory authority is not referred to in the <u>Final Results</u>, and even more significantly, in

the <u>Final Results</u> there is no specific analysis concerning, or finding by, Commerce as to whether

Hoogovens' questionnaire responses, or any other  conduct during the investigation, meets any of  the

specific criteria specified in § 1677e(a)(2), or whether Commerce complied with the prerequisite

conditions specified in § 1677m(d)) for invoking the authority to resort to "facts otherwise available."

<u>See</u> <u>Borden, Inc.</u>, 4 F. Supp. 2d 1221,1244 (CIT 1998).

The "facts available" statute, 19 U.S.C. § 1677e(a),  provides that Commerce "shall, subject

to section 1677m(d) * * *, use the facts otherwise available in reaching the applicable determination" if

"(1) necessary information is not available on the record, or" "(2) an interested party * * * (A)

withholds information that has been requested by the administering authority or the Commission * * *."

Defendant and the domestic plaintiffs contend that Commerce properly resorted to statutory facts

available because necessary information was not available on the record and Hoogovens withheld

requested information.  Hoogovens, however, claims that substantial evidence of record establishes its

claim that all sales were made at one level of trade, denies that it withheld any requested information,

and therefore, resort to other facts available was improper. Hoogovens further maintains that, in any

event, Commerce failed to comply with the prerequisite conditions under § 1677m(d) for use of other

facts available pursuant to

§ 1677e(a).

Specifically,  Hoogovens posits that Commerce's resort to facts available was improperly

predicated on the absence of information Commerce never requested. Continuing, Hoogovens

contends that since Commerce failed to ask for the pertinent information it says is now lacking in the record, Hoogovens should not be held responsible for any deficiency in its responses to the questionnaires, citing Queen's Flowers de Columbia  v. United States, 981 F. Supp. 617, 628-29 (CIT 1997) (citing Olympic Adhesives, Inc. v. United States, 899 F.2d 1565,1572-75 (Fed. Cir. 1990), and Helmerich & Payne v. United States, 24 F. Supp. 2d 304 (CIT 1998), citing Koyo Seiko Co. v. United States, 92 F.3d 1162, 1165 (Fed. Cir. 1996).  Hoogovens further maintains that Commerce failed to give proper weight to evidence that  Hoogovens' expert visited all major customers in the United States in each customer category on a regular basis, and failed to treat as highly probative - indeed compelling - that Hoogovens performed essentially the same services for end-users and service center customers in the United States. Commerce, however, found that the evidence of the visits "not useful." Final Results at 13208.

Defendant, contends that Commerce made it clear to Hoogovens that it required further information, provided further opportunity to submit additional information, and provided Hoogovens with an opportunity to respond to the supplemental questionnaires, which satisfies the prerequisite conditions of  § 1677m(d). Citing Borden, Inc. v. United States, supra,  Hoogovens, however,  insists there was no proper legal or factual basis under the statute for resort by Commerce to facts available pursuant to § 1677e(a)(1) or (2), and in any event,  Commerce failed to comply with 19 U.S.C. § 1677m(d) by promptly providing Hoogovens with notice that its questionnaire responses were "deficient" and by providing Hoogovens with an opportunity to remedy or explain any specific deficiency.

Subsection 1677e(a) provides that the use of facts otherwise available shall be subject to

§ 1677m(d).  <u>Borden</u>, 4 F. Supp. at 1244-45. Section 1677m, enacted as part of the Uruguay Round

Agreements Act, Pub. L. 103-465, § 231, is "designed to prevent the unrestrained use of facts

available as to a firm which makes its best effort to cooperate with [Commerce]."  <u>Borden,</u> <u>Inc. v.</u>

<u>United States</u>, 4 F. Supp. 2d at 1245.  Pursuant to § 1677m(d), entitled "Deficient submissions," if

Commerce determines that a response to a request for information does not comply with the request,

the agency is required to inform the person submitting the response of the deficiency and permit that

person an opportunity to remedy or explain the deficiency. If the remedial response or explanation

provided by the party is found to be "not satisfactory" or untimely, the information may be disregarded

<u>in favor of</u>  facts otherwise available, subject to

compliance with the prerequisite conditions of  § 1677m(d). However,  under § 1677m(e) the agency

may not decline to consider information that fails to meet the applicable requirements of the agency that

is submitted by an interested party and is necessary to the determination if certain five part criteria of

subsection (e) are met. <u>See</u> <u>Borden</u>, 4 F. Supp.2d at 1245 ("Subsection (e) may require use of the

respondent's information notwithstanding that an explanation is unsatisfactory.").  Significantly, however,

there is no suggestion whatever in the <u>Final Results</u> that any of Hoogovens' responses were

"disregarded" by Commerce in favor of facts otherwise available.

        In addressing the level of trade issues, the <u>Final Results</u> are clear Commerce determined that

Hoogovens had failed to prove its claim that sales were made at one level of trade, and are replete with

references to evidence <u>on the record</u> that, according to defendant and domestic steel producers,

constitute substantial evidence that Hoogovens' sales were made at two levels of trade rather than one.

Nonetheless, the parties also point to the reference in the <u>Final Results</u> to the basis for the determination

being "facts available,"  <u>Final Results</u> at 13208.

There is no clarification by Commerce as to whether such "facts available" refer to the available evidence <u>of record</u> alluded to by Commerce in its <u>Final Results</u> , or to resort to either or both § 1677e(a)(1) and (2). Commerce seemingly waffles between finding  the record  inadequate on the issue of selling functions and the lack of necessary information of record for a proper evaluation of level of trade, and also finding <u>from the evidence of record</u> that Hoogovens' sales were made at two different levels of trade. Thus, Commerce found from the evidence of record:  Hoogovens' sales were made through different channels of trade;  Hoogovens' made admissions that it performed varying levels of technical and quality assurance assistance with respect to its two customer categories; home market sales and export sales occur at two different stages in the marketing process;  there was a pattern of consistent price differences with respect to sales occurring at the two different stages of marketing in the home country; and the "historic commercial reasons related to the relative functions of service centers and end-users. <u>Id.</u> at 13207-08. Thus, in view of the foregoing, it may well be that the absence of any reference in the <u>Final Results</u> to its statutory authority under § 1677a(e)(1) and (2) or compliance with § 1677m(d) was intentional because Commerce's  use of the term "facts available" in the <u>Final Results</u> may simply have referred to the facts available <u>of record</u>.

The confusion concerning the evidentiary basis for Commerce's determination is further amplified by the contradictory and waffling arguments of counsel for defendant and the domestic steel producers. Thus, counsel for defendant and the domestic steel industry producers seek to support Commerce's determination that sales were made at two levels of trade on the basis of both the evidence of record pointed up by Commerce in the <u>Final Results</u> and "facts available" pursuant to §

1677e(a)(1) and (2) and § 1677m(d).

For example, defendant contends that "all of the available, non-conflicting, level of trade evidence demonstrated that Hoogovens' sales were made at two separate and distinct levels-of-trade." Deft's Mem. at 54 (emphasis added). However, defendant also posits that "Hoogovens' failure to provide detailed level of trade information left the Department with an inadequate record on the issue," Mem. at 19 (emphasis added), and therefore, "Commerce properly resorted to facts otherwise available." Deft's Mem. at 21. See also, e.g., Deft's Mem. at 20, 42, and 59.

Similarly the domestic steel industry producers  advance statutory facts available as a basis for sustaining the level of trade determination,  they also vigorously argue there is substantial evidence of record supporting Commerce's level of trade determination,  including much of the same evidence of record cited by Commerce: Hoogovens' unrebutted contradictory initial submissions in the second administrative review indicating Hoogovens' greater sales support to end-user customers than to service centers; other admissions of record in the third review; product brochure representations; and consistent patterns of price differences between customer categories. Domestic Plaintiffs' Mem. in Opposition to Hoogovens' Motion for Judgment on the Agency Record at 17, 20-24,31. As argued by the domestic steel producers, "based on the evidence of record, and consistent with the proper allocation of the burden of proof, the Department found evidence of two levels of trade in each market." Domestic plaintiffs Mem. in Opp. To Hoogovens' Motion for Judgment on Agency Record at 31.

A definitive disclosure by Commerce as to the precise evidentiary basis for each of its underlying factual findings leading to its determination there were two different levels of trade

( i.e., evidence of record - -judicially reviewed  pursuant to 19 U.S.C. § 1516a(b)(1)(B)(i))- - and/or

facts otherwise available pursuant to § 1677e(a)(1) or (2), or both, in compliance with the prerequisites

under § 1677m(d)), is a critical threshold requirement for further review of the level of trade issues in

this case.

In light of the seemingly contradictory contentions of the parties and the considerable

While Government counsel and counsel for the domestic steel industry producers sought to

support Commerce' level of trade determination on the basis of substantial evidence on the record

buttressed by facts available pursuant to § 1677e(a), fundamentally, of course, a reviewing court must

evaluate the validity of an agency decision on the basis of the reasoning presented in the decision itself.

An agency determination "cannot be upheld merely because findings might have been made and

considerations disclosed which would justify its order . . ." SEC v. Chenery Corp., 318 U.S. 80, 94

(1943). Nor may "post hoc rationalizations" of counsel supplement or supplant  the rationale or

reasoning of the agency. FPC v. Texaco, Inc., 417 U.S. 380, 397 (1974). See also Hoogovens Staal

BV, 4 F. Supp.2d at 1219.

In light of the seemingly contradictory contentions of the parties and the considerable

uncertainty left by the Final Results, the court remands to Commerce  for clarification of the evidentiary

basis for Commerce's factual determinations concerning level of trade. If Commerce's determination

that Hoogovens' sales were made at two different levels of trade was based on the evidence of record,

Commerce's remand results should so advise the court, with a summary of what evidence on the

record Commerce relied on. If, however, Commerce relied on

§ 1677e(a)(1) or (2), in whole or in part,  then in its remand results Commerce should so advise the

court, along with a full disclosure of evidence demonstrating that Commerce has complied with the

statutory prerequisite conditions under § § 1677e(a)(1) and/or (2), and 1677m(d)  for  use of that authority. see Borden, 4 F. Supp. at 1286.

### III.

### USE OF ADVERSE INFERENCES

If Commerce resorts to use of facts otherwise available pursuant to § 1677e(a), under § 1677e(b) Commerce, in selecting from among the facts otherwise available, may apply an adverse inference if it makes the additional finding that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." See Borden, 4 F. Supp. 2d at 1246. Hoogovens argues that Commerce erroneously found it to be uncooperative in responding to the questionnaires, and accordingly, erred in selecting from the facts "otherwise available" pursuant to § 1677e(a). Hoogovens further maintains that Commerce improperly invoked  "adverse inferences"against Hoogovens under 19 U.S.C. § 1677e(b).

Clearly, in pointing out in the Final Results that "[d]espite [the] apparent ability [to more fully respond], Hoogovens declined to provide all of the detailed information which the Department requested for purposes of conducting its LOT analysis,"  Id. at 13207, Commerce implicitly (if not explicitly) made a finding pursuant to § 1677e(a)(2)(A) that Hoogovens withheld requested information, and also a finding pursuant to § 1677e(b) that Hoogovens "has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce]." Nonetheless, defendant and the domestic steel industry producers, while insisting that Commerce relied on § 1677e(a), deny that Commerce used adverse inferences in making the level of trade determination pursuant to § 1677e(b). Significantly, even if the prerequisite conditions for the mandatory use of facts available in

reaching the applicable determination pursuant to § 1677e(a)(1) or (2) and § 1677m(d) exist, the use of adverse inferences under § 1677e(b) is <u>permissive</u>, not mandatory. The <u>Final Results</u> make no reference whatever to § 1677e.

As previously stated, since counsel's <u>post hoc</u> rationale cannot be accepted by the court as the basis for the agency's determination, the <u>Final Results</u> require clarification as to whether, and the extent to which, if any, Commerce relied on § 1677e, either subsection (a) or (b), and the facts of record demonstrating that Commerce met the prerequisite conditions.

**IV.**

**COMMERCE'S ALLEGEDLY IMPROPER USE OF AGGREGATE INFORMATION IN MAKING FINDINGS AS TO SALES IN THE U.S. MARKET.**

Hoogovens alleges that Commerce's level of trade determination is flawed because Commerce improperly utilized aggregated information, most of which applies only to the home market, to reach generalized conclusions regarding both markets. Thus, argues Hoogovens, because of its reliance on aggregated information, "Commerce's final determination contains virtually no analysis of Hoogovens' U.S. sales process." Hoogovens' Mem. at 30-31. In addressing the issue of levels of trade in its <u>Final Results</u> Commerce may not have articulated the findings applicable to U.S. sales with the precision and specificity that Hoogovens would have preferred. Nonetheless the court finds Commerce's analysis sufficiently clear that it covers Hoogovens' U.S. sales as well as home market sales. Therefore, Hoogovens' objection that Commerce's findings with respect to level of trade are deficient because they fail to address Hoogovens' sales in the U.S. market is without merit.

### WARRANTY AND TECHNICAL SERVICE EXPENSES

In its Final Results, Commerce treated all of Hoogovens' technical service and warranty

expenses as direct expenses in both the home market and U.S. market. 63 Fed. Reg. at 13205.

Accordingly, in the Final Results, Commerce deducted from the U.S. market (export)  price and home

market (normal) price the amount of the warranty and technical service expenses incurred in the

respective markets. Final Results at 13205.

Domestic steel producers  challenge the Final Results on the ground that Hoogovens had

unsegregated direct and indirect expenses which Commerce improperly treated as all direct expenses in

the home market.  Domestic steel producers, therefore, urge the court to remand with directions to

treat warranty and technical service expenses as direct in the U.S. market and to deny an adjustment

for such unsegregated expenses in the home market, which of course would result in increasing the

margin of dumping.

Defendant admits "[u]pon review of the domestic producers' brief, Commerce  may have erred

in its treatment of technical service and warranty expenses in the home market."Deft's Mem. at 59, and

requests a remand for reconsideration of the expenses in the home market.

Notwithstanding Commerce's admission of possible error in treating the expenses in question

in the home market as direct expenses, Hoogovens contends that in its margin calculation,  Commerce

properly treated the expenses in both markets the same (*viz.,* as direct expenses) and opposes remand.

Specifically, Hoogovens asserts: (1) Commerce is not automatically entitled to a remand simply

because it so requests; and (2) defendant failed to articulate any reasoned basis why Commerce should be allowed to reconsider its decision.

Fundamentally, of course,  "[a] request by Commerce for a  remand does not control the court." Timken Co. v. United States, 989 F. Supp. 234, 243 (CIT 1997). Hoogovens is correct that defendant did not explicitly concede error or specifically disclose any  factual basis justifying remand, but Commerce did point to the arguments raised in the domestic steel producers' brief as the basis for concession of possible error and  its request for remand. Domestic steel producers' brief spells out the nature of the alleged error in Commerce's treatment of Hoogovens' warranty and technical service expenses as all direct home market expenses. However, at this juncture the Government, understandably, does not wish to take a definitive position with respect to domestic producers' contentions  without further agency review.

The court is sufficiently clear as to the nature of the issues related to the home market warranty and technical service expenses that Commerce would address if the Final Results were remanded for reconsideration since defendant's admission of possible error is expressly based on the contentions raised by the domestic steel producers.  Therefore, there is a sufficiently specific basis for remand so that Commerce may first reconsider the matter before the court further reviews the issues related to the treatment of home market warranty and technical service expenses as direct expenses.

The Final Results are remanded to Commerce for reconsideration of its treatment of the home market warranty and technical service expenses as direct expenses.

## CONCLUSION

For the forgoing reasons, **IT IS HEREBY ORDERED THAT** the Final Results are remanded to Commerce for further proceedings consistent with this opinion..

**FURTHER ORDERED:** Commerce's <u>Remand Results</u> shall be filed with the Clerk of the court within ninety (90) days of the date of this decision. Plaintiffs may respond to the Remand Results within thirty (30) days from the date of filing the results with the court;  defendant shall have thirty (30) days from the filing of plaintiffs' briefs to respond. Any reply brief by plaintiffs is due within twenty (20) days of the filing of the brief to which a plaintiff is replying.

Dated: New York, New York
          January 21, 2000

                                    _____
                                              James L. Watson, Senior Judge