Slip-Op. 00-48

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____

|  |  |  |
|---|---|---|
| | : | |
| **TAIWAN SEMICONDUCTOR** | : | |
| **MANUFACTURING COMPANY, LTD.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Court No. 98-05-02184** |
| | : | **BEFORE: CARMAN, CHIEF JUDGE** |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Defendant,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **MICRON TECHNOLOGY, INC.,** | : | |
| | : | |
| **Defendant-** | : | |
| **Intervenor.** | : | |

_____:

Pursuant to Rule 56.2 of the Rules of this Court, plaintiff, Taiwan Semiconductor Manufacturing Co., Ltd. (TSMC), moves for Judgment Upon An Agency Record challenging the United States Department of Commerce's (Commerce) final determination in the antidumping duty investigation excluding TSMC as a producer in *Notice of Final Determination of Sales at Less Than Fair Value: Static Random Access Memory Semiconductors From Taiwan*, 63 Fed. Reg. 8909 (Feb. 23, 1998) (*Final Determination*), as amended by *Notice of Amended Final Determination and Antidumping Duty Order of Sales at Less Than Fair Value: Static Random Access Memory Semiconductors From Taiwan*, 63 Fed. Reg. 18883 (Apr. 16, 1998) (*Amended Final Determination*). TSMC argues Commerce's determination is not supported by substantial evidence on the record, and is otherwise not in accordance with law.

Defendant, United States, and defendant-intervenor, Micron Technology, Inc., oppose plaintiff's motion arguing Commerce's decision to exclude TSMC is based on substantial evidence on the record and is otherwise in accordance with law and should be sustained.

*Held*: This Court remands the *Final Determination* as amended by the *Amended Final Determination* made by Commerce in this matter for further consideration and clarification of the

agency record.


                                                    Date:  May 2, 2000


        *White & Case, LLP* (*Christopher F. Corr* and *Robert G. Gosselink*), Washington, D.C., for plaintiff.

        *David W. Ogden*, Acting Assistant Attorney General of the United States; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Velta A. Melnbrencis*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Melanie A. Frank*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Counsel, for defendant.

        *Hale & Dorr LLP* (*Gilbert B. Kaplan, Michael D. Esch, Paul W. Jameson,* and *Cris R. Revaz*), Washington, D.C., for defendant-intervenor.



                                        **OPINION**


        **CARMAN, CHIEF JUDGE:**  Pursuant to Rule 56.2 of the Rules of this Court, plaintiff, Taiwan Semiconductor Manufacturing Co., Ltd. (TSMC), moves for Judgment Upon An Agency Record challenging the United States Department of Commerce's (Commerce) final determination in the antidumping duty investigation excluding TSMC as a producer[1] in *Notice of Final Determination of Sales at Less Than Fair Value: Static Random Access Memory Semiconductors From Taiwan*, 63 Fed. Reg. 8909 (Feb. 23, 1998) (*Final Determination*), as amended by *Notice of Amended Final Determination and Antidumping Duty Order of Sales at Less Than Fair Value: Static Random*

---

        [1] The Court's use of the term "producer" with regard to plaintiff, Taiwan Semiconductor Manufacturing Co., Ltd. (TSMC) is not indicative of any finding of fact or conclusion of law by this Court.

*Access Memory Semiconductors From Taiwan*, 63 Fed. Reg. 18883 (Apr. 16, 1998).  TSMC

argues Commerce's determination is not supported by substantial evidence on the record and is

otherwise not in accordance with law.  Defendant, United States, and defendant-intervenor, Micron

Technology, Inc., maintain Commerce's determination should be sustained.  This Court has jurisdiction

pursuant to 28 U.S.C. § 1581(c) (1994).

## I.  BACKGROUND

On March 21, 1997, the United States Department of Commerce initiated antidumping duty

investigations regarding Static Random Access Memory Semiconductors (SRAMs) from the Republic

of Korea (Korea) and Taiwan covering the period January 1, 1996 through December 31, 1996.[2]  *See*

*Initiations of Antidumping Duty Investigations: Static Random Access Memory From the*

*Republic of Korea and Taiwan*, 62 Fed. Reg. 13596 (March 21, 1997) (*SRAMs from Taiwan*).

The merchandise subject to investigation is "synchronous, asynchronous, and specialty SRAMs from

Taiwan, whether assembled or unassembled. . . . Unassembled SRAMs include processed wafers or

die, uncut die and cut die."  *Final Determination*, 63 Fed. Reg. at 8910.

On April 16, 1997, Commerce issued questionnaires to twenty-two companies thought to be

---

[2] This antidumping duty investigation was initiated in response to a petition filed on February 25, 1997 by Micron Technology, Inc, defendant-intervenor in this action, alleging Static Random Access Memory Semiconductors (SRAMs) from the Republic of Korea (Korea) and Taiwan were being or were likely to be sold in the United States at less than fair value and such imports were materially injuring or were threatening material injury to the U.S. industry.  *See Initiations of Antidumping Duty Investigations: Static Random Access Memory From the Republic of Korea and Taiwan*, 62 Fed. Reg. 13596, 13597 (March 21, 1997) (*SRAMs from Taiwan*).

producers/exporters of SRAMs in Taiwan including plaintiff, TSMC.  Based on the information it

received from eighteen responding companies, Commerce determined it lacked the administrative

resources to investigate all producers and exporters of SRAMs as required by the antidumping duty

statute.[3]  Accordingly, pursuant to 19 U.S.C. § 1677f-1(c)(2)(B) (1994),[4] Commerce limited the

number of mandatory respondents, *i.e.,* producers or exporters under the statute, in the investigation.

*See Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of*

---

[3] 19 U.S.C. § 1677f-1(c)(1) (1994) states, in pertinent part:

(c) Determination of dumping margin

    (1) General Rule

      In determining weighted average dumping margins . . . the administering authority shall determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise.

[4] 19 U.S.C. § 1677f-1(c)(2)(B) (1994) states, in pertinent part:

(c) Determination of dumping margin
    . . .

    (2) Exception

      If it is not practicable to make individual weighted average dumping margin determinations under paragraph (1) [determining weighted average dumping margins for every known exporter and producer of subject merchandise] because of the large number of exporters or producers involved in the investigation or review, the administering authority may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to !
        . . .

        (B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

*Final Determination: Static Random Access Memory Semiconductors From Taiwan*, 62 Fed.

Reg. 51442, 51443 (Oct. 1, 1997) (*Preliminary Determination*).  Plaintiff, TSMC, sought to

participate in the investigation as a mandatory respondent as the world's largest semiconductor foundry

producing and selling fabricated SRAM wafers to its customers, namely design houses located in

Taiwan and the United States.


On May 21, 1997, Commerce selected five companies, including TSMC, as mandatory

respondents in the *SRAMs from Taiwan* investigation.[5]  (*See* Memorandum of May 21, 1997, from the

Team to Louis Apple, Acting Director, Import Admin., Pl. Pub. Exh. 3 (Respondent Selection

Memorandum).)  According to Commerce's Respondent Selection Memorandum, the five selected

companies represented 84.40 percent (by volume) of reported exports of the subject merchandise from

Taiwan during the period of investigation.  *Id.* at 2 n.4.  With respect to TSMC, Commerce noted an

apparent double counting of certain TSMC indirect sales to the United States, thus raising the issue

whether those sales should be attributed to TSMC as a producer or to its design house customer for

whom the SRAM wafers were manufactured.  Commerce noted:

> During the [period of investigation], TSMC produced and sold wafers to unaffiliated parties
> in the United States and Taiwan.  For U.S. sales, TSMC reported direct sales (i.e., sales in
> which wafers where [sic] shipped directly to U.S. customers) and indirect sales (i.e., sales in
> which wafers where [sic] shipped to [[***]] and processed into encapsulated SRAM[s] in

_____

[5] The five companies selected as mandatory respondents are: Integrated Silicon Solutions, Inc.,
Taiwan Semiconductor Manufacturing Company (TSMC), Winbond Electronics Corporation, Alliance
Semiconductor Corporation, and United Microelectronics Corporation.  (*See* Memorandum of May
21, 1997, from the Team to Louis Apple, Acting Director, Import Admin., Pl. Pub. Exh. 3, at 2
(Respondent Selection Memorandum).)

Taiwan prior to shipment to the United States). TSMC reported these indirect wafer sales to [[***]] as U.S. sales and [[***]] reported the encapsulated SRAMs as U.S. sales. This has resulted in a double counting of [***] die in the total die reported.

For respondent selection purposes, [Commerce has] been unable to determine which company should not have reported these double counted sales. Accordingly, [Commerce has] taken the conservative approach and selected TSMC as a respondent. However, [Commerce] recognize[s] that a more detailed analysis of the U.S. indirect sales and the additional manufacturing processes completed in Taiwan (i.e., a thorough analysis of respondents' response to Sections B, C, and D of [Commerce's] questionnaire), is necessary before [Commerce] can resolve this issue. Regardless of the resolution of this issue, TSMC will be considered by [Commerce] to be a mandatory respondent throughout the course of this investigation.

(Respondent Selection Memorandum, at 2 n.3.)

With the "double counting" issue thus unresolved prior to the issuance of its preliminary determination, Commerce proceeded with its investigation, receiving and reviewing responses to the questionnaires for all five companies selected as mandatory respondents. These responses provided extensive information about SRAM sales in Taiwan and the United States and SRAM production costs. TSMC filed its responses on June 16, 1997. In addition, Commerce solicited supplemental information from TSMC regarding the respective roles of a design house and a foundry, like TSMC, in the SRAM production process and sale of merchandise.

On October 1, 1997, Commerce published a preliminary determination in its antidumping duty investigation of SRAMs from Taiwan. *See Preliminary Determination,* 62 Fed. Reg. 51442. For the first time, Commerce announced it was reversing its decision to select TSMC as a mandatory

respondent.  In order to resolve the "double counting" issue, Commerce found it necessary to decide

which entity, the foundry (TSMC) or its design house customer, was the producer of the subject

merchandise contemplated by the antidumping duty statute.  Using the information submitted by plaintiff,

Commerce determined TSMC operated as a pure semiconductor foundry during the period of

investigation and "the entity that controls and owns the SRAMs design, *i.e.*, the design house, controls

the production, and ultimate sale, of the subject merchandise."  *Id.* at 51444.  Therefore, the design

house was designated as the producer of the subject merchandise.  Consequently, since Commerce

determined TSMC operated as a foundry and not a producer for the purposes of the antidumping duty

statute throughout the period of investigation, Commerce determined TSMC should no longer be

considered a respondent in the investigation.  *See id.*

Commerce's exclusion of TSMC was in accordance with a September 23, 1997, Commerce

memorandum that concluded foundries, such as TSMC, that manufacture processed SRAM wafers

according to designs provided the design houses are not considered producers of the SRAMs under

the statute because the design houses have ultimate control over how the merchandise is produced and

the manner in which it is ultimately sold.  (*See* Memorandum of September 23, 1997 from the Team to

Louis Apple, Director, Import Admin., Pub. Doc. 346, Pl. Pub. Exh.  4, at 9, 11 (Foundry Elimination

Memorandum).)

In both the Foundry Elimination Memorandum and *Preliminary Determination*, Commerce

considered TSMC's role in the SRAM production and sale processes[6] in light of Commerce's policy

toward subcontractors or tollers.  At the time of the SRAM investigation in this action, Commerce's

policy was set forth in proposed regulation 19 C.F.R. § 351.401(h).[7]  *See Antidumping Duties;*

*Countervailing Duties*, 61 Fed. Reg. 7308, 7330, 7381 (1996) (codified at 19 C.F.R. Part 351)

(proposed Feb. 27, 1996) (*Proposed Rules*).  The proposed regulation stated Commerce "will not

consider a toller or subcontractor to be a manufacturer or producer where the toller or subcontractor

does not acquire ownership, and does not control the relevant sale, of the subject merchandise."  *Id.* at

7381.

Applying Commerce's tolling and subcontractor policy, Commerce determined TSMC was not

the producer of the subject merchandise because foundries do not own the SRAM designs and,

therefore, Commerce concluded foundries, like TSMC, do not own, control the relevant sale of, or

control the production of the subject merchandise.  Commerce regards the design of a processed

SRAM wafer as the element of production which imparts the essential features of the product.  In the

---

[6] Plaintiff, TSMC, and defendant, United States Department of Commerce (Commerce), appear to agree that the SRAM production process includes the following steps:  (1) SRAM wafer research, development and design; (2) wafer mask production based on the wafer design; (3) wafer fabrication using the wafer mask; (4) wafers probing and testing to check the functionality of all the die on the wafer; (5) die casing and packaging; (6) die pre-burn-in, burn-in and post burn-in testing; (7) die marking and lead attachment; (8) sale of die.  (*See* Memorandum of September 23, 1997 from the Team to Louis Apple, Director, Import Admin., Pub. Doc. 346, Pl. Pub. Exh. 4 (Foundry Elimination Memorandum).)  TSMC participates in this process by manufacturing wafer masks and wafers and selling SRAM wafers to its design house customers in accordance with negotiated foundry agreements.

[7] Proposed regulation 19 C.F.R. § 351.401(h) was finalized May 19, 1997.  *See Antidumping Duties; Countervailing Duties; Final Rule*, 62 Fed. Reg. 27296 (May 19, 1997).

*Preliminary Determination*, Commerce found

> [t]he design house produces, or arranges and pays for the production of, the design mask.  At all stages of production, it retains ownership of the proprietary design and design mask.  The design house then subcontracts the production of processed wafers with a foundry and provides the foundry with the design mask.  Design houses tell the foundry what and how much to make. . . . The foundry has no right to sell those wafers to any party other than the design house unless the design house fails to pay for the wafers.  Once the design house takes possession of the processed wafers, it arranges for the subsequent steps in the production process (*i.e*., probing, testing, and assembly), then sells the encapsulated SRAMs to downstream customers.

*Preliminary Determination,* 62 Fed. Reg. at 51444.  Consequently, based on these findings and Commerce's policy toward subcontractors, Commerce determined the entity that controls and owns the SRAM design, *i.e*., the design house, rather than the foundry, is more appropriately deemed the "producer" under the statute for the purpose of this investigation.

On October 14, 1997, TSMC filed unsolicited comments with Commerce explaining and justifying its standing as a producer respondent and requesting Commerce reconsider its preliminary determination.  Commerce informed TSMC on October 29, 1997, that Commerce's determination as to TSMC's producer status would not be altered, and, accordingly, Commerce would not engage TSMC in the verification process.   Commerce published its Final Determination in the investigation on February 23, 1998.  *See Final Determination*, 63 Fed. Reg. at 8909.  In it Commerce reiterated its preliminary determination regarding the exclusion of TSMC from the investigation.  On May 15, 1998, TSMC timely filed this action.

II.  CONTENTIONS OF THE PARTIES

A.      *Plaintiff*

Plaintiff, TSMC, contends Commerce's determination to exclude TSMC from Commerce's investigation of SRAMs from Taiwan was contrary to law, regulations, and record facts.  Plaintiff argues Commerce improperly determined that TSMC was not a producer under 19 U.S.C. § 1677f-1(c)(2) which allows Commerce to calculate dumping margins for a reasonable number of exporters and producers accounting for the largest volume of the subject merchandise.

TSMC asserts Commerce, in its determination, misapplied proposed regulation 19 C.F.R. § 351.401(h) which states Commerce will not consider a subcontractor to be a producer under the antidumping statute when the company (1) does not acquire ownership of the subject merchandise, and (2) does not control the relevant sale of the subject merchandise.  *See Proposed Rules*, 61 Fed. Reg. at 7381.  Although plaintiff admits the proposed regulation was not formally applicable to the *SRAMs from Taiwan* investigation, plaintiff asserts since Commerce acknowledged the proposed regulation codifies the requirements of law and sets out agency practice and policy, the language of the proposed regulation should be strictly enforced, and Commerce should be bound by its own regulation.  Assuming *arguendo* that TSMC is a subcontractor, TSMC contends that neither prong was satisfied, and, therefore, Commerce's decision to deny TSMC producer status is contrary to law.

As to prong one of the proposed regulation, TSMC contends Commerce ignored undisputed record evidence that TSMC owns or acquires legal title to the subject SRAM wafers prior to sale and

shipment to its customers. TSMC argues Commerce's focus on ownership of the SRAM design and

mask by the design houses is misguided because the SRAM wafer, not its design, is the subject

merchandise at issue. Also, TSMC contends ownership of the design and design mask cannot confer

ownership of the finished SRAM wafer on TSMC's customers who supply the design. Since it is

uncontroverted that TSMC owns legal title to the SRAM wafers, TSMC argues Commerce's decision

to exclude TSMC as a producer is contrary to the regulation and must be reversed.

As to the second prong of the proposed regulation, whether a company controls the relevant

sale of the subject merchandise, TSMC asserts it is unclear to which sale Commerce refers in the

proposed regulation as the "relevant sale." TSMC argues Commerce used two interpretations during

the *SRAMs from Taiwan* investigation; first, the sale by TSMC to the design house, and second, the

sale by the design house to its customers. TSMC asserts the only relevant sale is the sale to the design

house because no seller can control where an unrelated customer subsequently resells the product.

Regardless of which sale Commerce intended to use, TSMC contends Commerce erred because

TSMC exerts control in both sales transactions.

Assuming *arguendo* that the relevant sale is that by TSMC to its design house customers,

TSMC maintains it controls the sales transaction. First, TSMC sales are based on foundry agreements

which are freely negotiated in situations where, due to its size and income, TSMC has the negotiating

advantage. Therefore, TSMC controls the amount of subject merchandise it produces and sells to a

particular customer. Furthermore, TSMC argues, its legal obligation to fulfill the terms of a sales

contract does not connote a loss of control. TSMC asserts it controls the relevant sale of subject

merchandise to its customers.


In addition, TSMC contends Commerce's analysis that TSMC's design house customers

control the sale of the subject merchandise because they control the production of SRAMs at TSMC is

flawed. When Commerce looks to the control of "production" in its analysis, TSMC argues,

Commerce goes beyond 19 C.F.R. § 351.401(h) which only requires Commerce to consider

ownership and control of the relevant sale of the subject merchandise. Even assuming *arguendo*

control of production was relevant, TSMC argues it controls production of the subject merchandise

because (1) TSMC purchases and controls the raw materials used in the production process and holds

legal title to all raw materials; (2) TSMC controls all costs related to the SRAM wafer production

process; (3) TSMC decides how much of its capacity to commit to a customer; (4) TSMC decides

what products, processes, and design rules to make available; (5) TSMC conducts all the research and

development related to process technology and holds exclusive intellectual property rights in this

technology; (6) TSMC directs the production process and does not permit customers on the foundry

floor except by prior appointment and approval of TSMC. TSMC argues these facts clearly

demonstrate that it controls the production of the subject merchandise. Given that neither element

required by proposed regulation 19 C.F.R. § 351.401(h) was satisfied, TSMC contends Commerce's

determination to exclude it as a respondent from the *SRAMs from Taiwan* investigation was contrary

to law.

TSMC also argues that Commerce's determination to exclude TSMC was contrary to

established precedent because Commerce routinely has granted producer status to, and calculated

individual margins for, producers that manufacture and sell custom-made products which are produced

based on customer-provided designs/specifications.[8]  Given this precedent, TSMC maintains,

Commerce's exclusion of TSMC as a producer because TSMC does not own the wafer design is

contrary to law as established in prior cases.

TSMC additionally argues Commerce's decision not to verify the information submitted by

TSMC was contrary to law and regulations.[9]  TSMC asserts in order to meet the requirements of the

---

[8] Plaintiff, TSMC, cites *Engineered Process Gas Turbo-Compressor Systems From Japan*, 62 Fed. Reg. 24394 (May 5, 1997); *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.*, 62 Fed. Reg. 2081 (Jan. 15, 1997); *Certain Corrosion-Resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate From Canada*, 61 Fed. Reg. 51891 (Oct. 4, 1996); *Mechanical Transfer Presses From Japan*, 62 Fed. Reg. 11820 (March 13, 1997); and *Large Power Transformers From Japan*, 56 Fed. Reg. 29215 (June 26, 1991).

[9] TSMC cites 19 U.S.C. § 1677m(i) (1994) which states Commerce "shall verify all information relied upon in making . . . a final determination in an investigation" and the statute's implementing regulation 19 C.F.R. § 351.307(b) which provides "the Secretary will verify factual information upon which the Secretary relies in . . . a[n] . . . antidumping investigation."

The Court notes both TSMC and Commerce cite to 19 C.F.R. § 351.307(b) as the implementing regulation for 19 U.S.C. § 1677m(i); however, the appropriate citation for the statute's implementing regulation applicable during the year in which Commerce applied the regulation, *i.e.*, 1997, was 19 C.F.R. § 353.36(a) (1997).  19 C.F.R. § 351.307(b) is the current citation for Commerce's verification of information regulation.  The Court notes the language of the 1997 regulation

statute or regulation, Commerce must establish record evidence either supporting or authenticating the

factual information upon which Commerce relies in making its final determination.  When confronted

with contradictory evidence on the record, TSMC contends Commerce should have continued the

investigative process until obtaining corroborating evidence.  TSMC argues  Commerce's

understanding and interpretation of the facts were contradicted explicitly by TSMC in numerous

submissions both prior to and after the preliminary determination.  In failing to explore these

discrepancies, TSMC contends Commerce violated the statute and regulation.


Also, TSMC argues by refusing to conduct on-site verification of TSMC questionnaire

responses, Commerce essentially left TSMC without an administrative remedy.  TSMC maintains

because verification was necessary to establish TSMC as a producer of subject merchandise and to get

TSMC's verified cost and sales data on the record, by refusing to verify the contradictory record,

Commerce effectively denied TSMC any meaningful opportunity to show that the information upon

which Commerce relied to make its decision was incorrect.


TSMC further argues Commerce's determination to exclude TSMC was not supported by

substantial evidence on the record because Commerce failed to take into account evidence supporting

TSMC's status as a producer of subject merchandise.  TSMC contends the failure to account for a

---

is substantially similar to the current regulation cited by the parties.  19 C.F.R. § 353.36(a) provided
"[t]he Secretary will verify all factual information the Secretary relies on in . . . A final determination
under . . . § 353.20 [1997] [final antidumping determination]."

significant body of evidence which detracts from the agency determination is a failure to articulate a

rational connection between the facts and the decision made by Commerce.

First, TSMC maintains the record does not support a finding that TSMC's customers control

the production of the subject merchandise because TSMC freely negotiates foundry agreements which

specify the type and amount of its wafer production for its customers.   According to TSMC,

Commerce mistakenly confused these voluntary contractual commitments with lack of control.

Moreover, TSMC decides itself whether to dedicate capacity for a customer, what products to make,

and what processes to use in production.  Because Commerce ignored or failed to consider this

evidence, TSMC argues Commerce's determination cannot be considered to be supported by

substantial evidence.

Moreover, TSMC argues its involvement in the SRAM production process was not

insignificant.  TSMC produces the SRAM design masks and conducts the entire SRAM fabrication

process.  According to TSMC, its contribution determines the very identity of the subject merchandise

as it is the location of fabrication which confers the origin of an SRAM which, in turn, determines

whether it is within the scope of this investigation.

Second, TSMC argues Commerce's statements in its determinations ignore evidence of

TSMC's ownership of SRAM wafers and of TSMC's ownership and production of virtually all the

SRAM design masks used in TSMC's production facilities.  Moreover, TSMC contends, contrary to

Commerce's assertion, the design masks are not inputs used in the production process or components

of the finished product.  TSMC argues Commerce changed its position on this point because in the

preliminary determination Commerce treated design masks as inputs used by TSMC in the production

process, however, in the final determination Commerce stated that it was irrelevant whether the masks

were characterized as inputs or equipment.  TSMC argues this reversal contradicts and discredits

Commerce's preliminary determination that TSMC's customers control the production and sale of the

subject merchandise.

Third, TSMC argues Commerce failed to consider TSMC's expenditures on the research and

development (R&D) of the SRAM production process.  While recognizing TSMC's R&D efforts,

Commerce's preliminary determination focused only on the product-related R&D expenditures of

TSMC's customers.  Contrary to Commerce's assertions, TSMC's process R&D, which relates to

etching, photoresist, deposition, and photolithograpy, is as crucial to the production process and

performance of the finished SRAMs as the product-related R&D conducted by TSMC's design house

customers.  Commerce's failure to take into account the substantial evidence and importance of

TSMC's role in developing and producing the subject merchandise, TSMC argues, detracts from

Commerce's final determination.  For all these reasons, TSMC argues, Commerce's determination to

exclude TSMC was not supported by substantial evidence on the record.

TSMC further argues Commerce's determination to exclude TSMC and not to verify TSMC's submitted data were contrary to the requirements of procedural fairness. TSMC contends Commerce's actions violated federal precedent which requires Commerce to give a respondent an opportunity to respond when Commerce makes a binding decision about its respondent's status. Because Commerce noted in its Respondent Selection Memorandum, "TSMC will be considered . . . to be a mandatory respondent throughout the course of this investigation," TSMC contends it was procedurally unfair for Commerce to reverse abruptly its position in the preliminary determination. (Respondent Selection Memorandum, at 2 n.3.) According to TSMC, since Commerce did not afford it a hearing on this matter prior to the completion of verification, TSMC was denied both the opportunity to participate meaningfully in the investigation and any resulting substantive relief because no verified facts existed on the record.

B.     *Defendant*

Defendant, Commerce, maintains its decision to exclude TSMC as a producer in the *SRAMs from Taiwan* investigation is supported by substantial evidence and is otherwise in accordance with law.

Commerce argues it has broad discretion in devising its own methodology for determining who is a producer in a particular investigation as Congress did not specify in the antidumping duty statute the criteria by which Commerce is to determine the proper producer in a particular case. In this case,

Commerce argues it properly exercised its discretion in determining TSMC's design house customer to be the producer because the design house owns the SRAM design which means it owns, controls the production of, and controls the relevant sale of the subject merchandise.

According to Commerce, its determination was in accordance with its policy toward subcontractors which is reflected in the preamble to the proposed regulation 19 C.F.R. § 351.401(h). Commerce maintains under its policy it must review the totality of the circumstances in each case to determine whether a party is a producer of the subject merchandise. Moreover, Commerce argues proposed regulation 351.401(h) merely sets forth a non-exclusive list of conditions under which Commerce will not find a subcontractor to be a producer of the subject merchandise. Therefore, it is free to consider other relevant factors. Also, Commerce counters TSMC's argument regarding custom-made merchandise by emphasizing that those cases were decided under Commerce's prior subcontractor policy and did not involve subcontracted sales. Commerce maintains its decision to exclude TSMC is in accordance with the law.

Commerce also contends its exclusion of TSMC is supported by substantial evidence. Using the stages of SRAM production as a backdrop, Commerce argues, as compared to the design house, TSMC only plays a minimal role in the production process. Commerce maintains the design house (1) produces the SRAM design which is the most important element in the subject merchandise because it provides the essential characteristics of the SRAMs, (2) retains intellectual property rights in the design

of SRAM wafers throughout the production process, even though during fabrication the SRAM wafers are owned by TSMC, (3) initiates and oversees, the production process pursuant to the design house's foundry agreement with TSMC, (4) performs and subcontracts the remaining steps in the production process, *e.g.*, probing, testing, and packaging, once TSMC sells the wafers to the design house after fabrication, and (5) oversees the ultimate sale of the SRAM wafers to U.S. customers. Because the design house controls the SRAM production process and the manner in which the merchandise was sold, Commerce argues its determination that TSMC was not the producer of the subject merchandise is supported by substantial evidence.

Moreover, Commerce argues TSMC's arguments are meritless. First, Commerce refutes TSMC's argument that TSMC was a producer and owner of SRAM wafers under the proposed regulation. Commerce maintains that even if TSMC did hold some nominal title to the subject merchandise the issue of ownership is not determinative as the proposed regulation is not formally applicable and only provides guidance to Commerce in determinations of producer status. Commerce discounts TSMC's temporary and nominal title to the subject merchandise as merely a security measure to protect the design house from risk of loss during fabrication.

Commerce also maintains it reasonably determined that the design house controlled the relevant sale because, for the purposes of calculating antidumping duties, Commerce must look to the price at which the producer sells the merchandise for exportation to the United States. Citing 19 U.S.C. §

1677b(e) (1994), the definition of constructed value under the antidumping duty statute, defendant

argues it was reasonable for Commerce to consider the sale by the design house as the relevant sale.

Defendant contends the sale by the design house reflects all costs (design, fabrication, packaging, etc.)

related to SRAM production. Moreover, Commerce maintains that even if the relevant sale were from

TSMC to the design house, TSMC still does not control the sale of SRAMs because, under its foundry

agreements, TSMC only has a right to sell its production to the particular design house who owns and

supplied the SRAM design for that production.


     As to control of production, Commerce argues, having interpreted the proposed regulation as

providing guidance only, it properly considered control of production and determined the design house

controlled production after evaluating the SRAM production process. Commerce maintains, despite

TSMC's assertions, that pursuant to the foundry agreements, TSMC and its customers agreed on a

manufacturing process and the design houses were involved in other aspects of SRAM fabrication.

Moreover, Commerce contends, even if TSMC played a significant role in the production process, its

determination was correct because the proposed rule specifically notes that when the owner or

contractor has ultimate control over how the merchandise is produced and the manner in which is it

ultimately sold, "[t]he Department will not consider the subcontractor to be the . . . producer,

regardless of the proportion of production attributable to the subcontracted operation." *Proposed*

*Rules*, 61 Fed. Reg. at 7330.

In addition, Commerce contends, contrary to TSMC assertions, it properly considered all relevant information in making its determination to exclude TSMC as a producer. First, Commerce argues it did consider evidence that TSMC freely negotiates with its customers but found this fact to neither support nor undermine its finding regarding the producer status of the design houses. Second, Commerce contends it considered TSMC's ownership of the subject merchandise and design mask but came to a different conclusion based on those facts. Commerce found TSMC's lack of proprietary rights to undermined TSMC's ownership of these items. Also, Commerce asserts its final determination was not based on the classification of the design masks as "inputs" or "equipment." Third, Commerce argues it specifically recognized in the final determination that TSMC performed process R&D but correctly found it irrelevant given that the design house performed all product-related R&D.

Commerce contends its decision not to verify TMSC's information was not contrary to law or regulation. According to Commerce, the statutory and regulatory intent of 19 U.S.C. § 1677m(i) and 19 C.F.R. § 351.307(b)[10], respectively, permits Commerce to conserve scarce administrative resources. To require Commerce to verify information of those companies not determined to be respondents in an investigation would frustrate Congressional and administrative intent. Commerce argues once TSMC was excluded as a respondent from the investigation, Commerce had no need or obligation to verify TSMC's data. Commerce argues its decision is not contrary to law.

---

[10] The Court notes the appropriate citation for this regulation is 19 C.F.R. § 353.36(a). *See supra* note 9.

Finally, Commerce maintains it did not violate any requirements for procedural fairness by eliminating TSMC as a producer. Commerce argues TSMC was on notice of Commerce's investigation of TSMC's producer status through comments made in the Respondent Selection Memorandum dated May 1997 addressing the question of direct versus indirect sales. Commerce notes that TSMC not only responded to those comments in May 1997 but also had the opportunity to address the issue in a letter to Commerce in October 1997 after issuance of the preliminary determination. Commerce contends that the extensive facts and analysis on the record leading to the preliminary determination and beyond indicate the level of opportunity and comment afforded TSMC and the full consideration of this issue by Commerce. Also, Commerce argues it is well-established that Commerce may make changes during the administrative process.

For all these reasons, Commerce argues its decision to exclude TSMC as a mandatory respondent was in accordance with law and based on substantial evidence on the record.

C.     *Defendant-Intervenor*

Defendant-Intervenor, Micron Technology, Inc. (Micron), argues Commerce's determination to exclude TSMC was in accordance with law and based on substantial evidence on the record. Because the Court finds Defendant-Intervenor's arguments in this matter substantially similar to those presented by defendant, United States, the Court will not recount them in this opinion, although they have been duly considered.

III. STANDARD OF REVIEW

This Court must sustain an administrative antidumping duty determination unless it is

"unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19

U.S.C. § 1516a(b)(1)(B) (1994). Substantial evidence is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co., Ltd. v. United*

*States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S.

197, 229 (1938)). In determining whether Commerce's interpretation and application of the

antidumping duty statute is in accordance with law, the Court must consider whether the statute

addresses the specific question at issue, and if not, whether the agency's interpretation of the statute is

reasonable. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837,

842-43 (1984). This Court must accord considerable weight to Commerce's construction of the

antidumping duty statute. *See E.I. Du Pont De Nemours & Co. v. United States*, 8 F. Supp. 2d

854, 858 (CIT 1998).

IV. DISCUSSION

In an antidumping duty investigation, Commerce determines whether subject merchandise is

being, or is likely to be, sold in the United States at less than its fair value. *See* 19 U.S.C. §

1673d(a)(1) (1994). Commerce makes this determination by "comparing the weighted average of the

normal values to the weighted average of the export prices (and constructed export prices) for

comparable merchandise." 19 U.S.C. § 1677f-1(d)(1)(A)(i) (1994). A weighted average dumping

margin is determined by calculating the individual weighted average dumping margin for each known

exporter and producer of the subject merchandise. *See* 19 U.S.C. § 1677f-1(c)(1) (1994). A

dumping margin need not be calculated for every exporter and producer, however, "[i]f it is not

practicable . . . because of the large number of exporters or producers involved in the investigation."

19 U.S.C. § 1677f-1(c)(2) (1994). Commerce, then, may limit "its examination to . . . (B) exporters

and producers accounting for the largest volume of the subject merchandise from the exporting country

that can be reasonably examined." *Id.* In this case, Commerce selected five mandatory respondents,

including plaintiff, TSMC, for the *SRAMs from Taiwan* investigation due to limited resources. (*See*

Respondent Selection Memorandum, Pl. Exh. 3, at 2.) Subsequent to the selection process,

Commerce reversed its decision to include TSMC as a respondent because it found, citing the

preamble[11] and proposed regulation 19 C.F.R. §351.401(h), TSMC did not qualify as a producer[12]

_____

[11] The Court uses the term "preamble," as Commerce does in its submissions, to reference the paragraph in the proposed regulations regarding proposed regulation 19 C.F.R. § 351.401(h). (*See* Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment on the Agency Record (Def. Brief), Court No. 98-05-02184, at 34 (citing *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7308, 7330 (1996) (codified at 19 C.F.R. Part 351) (proposed Feb. 27, 1996) (*Proposed Rules*)).)

[12] The issue of whether TSMC is an exporter of the subject merchandise under the statute does not appear to be before this Court. In the preliminary and final determinations in this matter, Commerce seems to focus solely on whether TSMC is a producer of the subject merchandise *See Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Static Random Access Memory Semiconductors From Taiwan*, 62 Fed. Reg. 51442, 51443 (Oct. 1, 1997) (*Preliminary Determination*); *Notice of Final Determination of Sales at Less Than Fair Value: Static Random Access Memory Semiconductors From Taiwan*, 62 Fed. Reg. 8909 (Feb. 23, 1998) (*Final Determination*), as amended by *Notice of Amended Final Determination and Antidumping Duty Order of Sales at Less Than Fair Value: Static Random*

under the statute.  *See Preliminary Determination*, 62 Fed. Reg. at 51444.


        Plaintiff, TSMC, argues that Commerce's decision to exclude it from the *SRAMs from Taiwan*

investigation as a proper producer respondent was not in accordance with law because Commerce did

not strictly adhere to its own regulation.  According to TSMC, the only relevant factors for Commerce

to consider in determining whether a subcontractor is a producer are ownership and control of the

relevant sale as enumerated by the proposed regulation.  TSMC argues Commerce, contrary to the

proposed regulation, improperly considered control of production and ignored evidence of TSMC's

ownership of the subject merchandise.  Also, TSMC contends Commerce's interpretation of the statute

with respect to the "relevant sale" consideration under the proposed regulation is unreasonable and not

in accordance with law.

---

*Access Memory Semiconductors From Taiwan*, 63 Fed. Reg. 18883 (Apr. 16, 1998).

        Even so, the Court notes plaintiff, TSMC, appears to address this issue in reply to Defendant's
statement "TSMC does not claim before this Court that is was the exporter of SRAMs."  (Defendant's
Brief, at 27.)  In its reply, TSMC states "the first sentence of the statement of facts in TSMC's case
brief states: 'Plaintiff TSMC is a producer and exporter of the subject merchandise.'" (*See* Reply of
Plaintiff Taiwan Semiconductor Manufacturing Co., Ltd. in Support of Motion for Judgment on the
Agency Record (Plaintiff's Reply), Court No. 98-05-02184, at 13 (quoting Memorandum of Points
and Authorities in Support of Motion of Taiwan Semiconductor Manufacturing Co., Ltd. for Judgment
on the Agency Record (Plaintiff's Brief), Court No. 98-05-02184, at 3).)  However, the Court notes
plaintiff also states in its reply brief, "TSMC is appealing Commerce's decision that TSMC is not a
producer of subject merchandise, in violation of its own regulation."  (Plaintiff's Reply, at 14.)  Because
Commerce based its determination on consideration of TSMC as a producer, the Court, in this opinion,
will address TSMC's status as a producer under the antidumping duty statute in the context of TSMC's
indirect and direct sales to the United States.

Commerce argues its decision to exclude TSMC was otherwise in accordance with law by maintaining proposed regulation 351.401(h) was not directly applicable as a rule at the time of the *SRAMs from Taiwan* investigation and only served as guidance for Commerce's determination of producer status. Moreover, Commerce maintains it evaluated, in accordance with law, all factors relevant to a proper determination in this matter including some not enumerated in the proposed regulation. Section 351.401(h)'s preamble, argues Commerce, directs it to consider a broader number of factors. Also, Commerce cites its broad discretion to interpret terms in the antidumping statute and its own regulations.[13] Moreover, Commerce argues its interpretation of the "relevant sale" under the statute is reasonable, in accordance with law, and entitled to deference.

In determining whether Commerce's interpretation and application of the antidumping statute is in accordance with law, this Court must first determine whether Congress has "'directly spoken to the precise question at issue.'" *See E.I. Du Pont De Nemours*, 8 F. Supp. 2d at 857 (quoting *Chevron*, 467 U.S. at 842-43). The antidumping statute defines the term "producer" as "the producer of the subject merchandise." 19 U.S.C. § 1677(28) (1994). The statute, however, does not identify the criteria by which Commerce will deem a person or entity a producer. Because the statute is silent as to this issue, "'the question for the court is whether the agency's answer is based on a permissible' or

---

[13] While Commerce asserts its determination of producer status should be based on the "totality of the circumstances," *Polyvinyl Alcohol From Taiwan: Final Results of Antidumping Duty Administrative Review*, 63 Fed. Reg. 32810, 32813 (June 16, 1998), the Court notes that this standard was applied only after the determination in the instant case in February of 1998.

reasonable 'construction of the statute.'" *Du Pont,* 8 F. Supp. 2d at 857 (quoting *Chevron*, 467 U.S.

at 842-43); 19 U.S.C. § 1677(28)*; see Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1573 (Fed.

Cir. 1994).

To make its determination in this matter, Commerce relies upon its interpretation of the term

"producer" as developed in prior cases and its regulations. In conjunction with the Uruguay Round

Agreements Act of 1994, Commerce propounded proposed regulations which establish "general rules

that apply to the calculation of export price, constructed export price and normal value" under the

antidumping duty statute and further clarify Commerce's interpretation of the term "producer" under the

statute. *Proposed Rules,* 61 Fed. Reg. at 7308. The term "producer" was defined by Commerce in

proposed regulation 19 C.F.R. § 351.401(h) which states Commerce will not consider a subcontractor

to be a producer where the "subcontractor does not acquire ownership, and does not control the

relevant sale of the subject merchandise or foreign like product." *Id.* at 7381.

Commerce's interpretation of the statute as reflected in proposed section 351.401(h) includes

both the proposed regulation and the preamble of the proposed regulation.[14] *See Proposed Rules*, 61

---

[14] The parties dispute the scope and applicability of the law in this case. While Plaintiff seeks the Court's strict enforcement of proposed regulation 351.401(h) by its terms and language, the defendant argues the proposed regulation, "while not applicable to this investigation, codifies past practice and current policy" with respect to subcontractors which the proposed regulation restates in conjunction with the preamble. *Preliminary Determination,* 62 Fed. Reg. at 51444. Defendant maintains it properly considered factors included in the preamble, although not specifically enunciated in the proposed regulation, to determination TSMC's producer status.

Fed. Reg. at 7330, 7381.   As stated, the proposed regulation instructs Commerce to consider

ownership and control of the relevant sale when determining the producer status of a subcontractor.

*See id.* at 7381.   However, the preamble explanation suggests Commerce intended a broader number

of factors to be considered.   The preamble states:

> [n]ew paragraph (h) deals with the Department's treatment of subprocessor or "tollers."
> Several commentators expressed support for the Department's recent decision that tolling
> operations (i.e., subcontractors) should not be treated as manufacturers or producers of the
> subject merchandise.  The Department concurs with those commentators who urged that,
> because this policy has not been widely publicized, that it be enunciated in the regulations.
> Under paragraph (h), where a party owning the components of subject merchandise has a
> subcontractor manufacture or assemble that merchandise for a fee, the Department will
> consider the owner to be the manufacturer, because that party has ultimate control over how
> the merchandise is produced and the manner in which it is ultimately sold.  The Department will
> not consider the subcontractor to be the manufacturer or producer, regardless of the proportion
> of production attributable to the subcontracted operation or the location of the subcontractor or
> owner of the goods.

*Proposed Rules*, 61 Fed. Reg. at 7330.

---

In considering the scope and applicability of proposed regulation 19 C.F.R. § 351.401(h), the
Court notes part 351 of the Code of Federal Regulations only directly "appl[ies] to all administrative
reviews initiated on the basis of . . . petitions filed or requests made after June 18, 1997."  19 C.F.R. §
351.701 (1998).  For proceedings "initiated on the basis of petitions filed or requests made after
January 1, 1995, but before part 351 applies [June 18, 1997], part 351 will serve as a restatement of
the Department's interpretation of the requirements of the Act as amended by the [Uruguay Round
Agreements Act]."  *Id.*  The investigation in this matter was initiated by petition in May of 1997 which
was filed after January 1, 1995 but prior to the applicability date of 19 C.F.R. part 351.  Therefore, the
Court will treat the proposed regulation as a "restatement of the Department's interpretation" of the
term "producer" under the statute.  Due to this finding, the Court will not enforce a strict construction of
the proposed regulation by its language and terms as argued for by TSMC because it is not directly
applicable to the instant investigation. S*ee Brass Sheet and Strip From the Netherlands: Final
Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 51449, 51451 (Oct. 1, 1997)
("These regulations do not govern . . . because the review was initiated prior to the date the regulations
became effective. . . [h]owever, . . . they do provide guidance.").

Commerce's restatement of its interpretation of "producer" as reflected in the preamble is an attempt to codify its existing practice toward subcontractors. While the Court notes historically, in cases involving tolled sales, *i.e.*, sales in which the seller retained ownership of the merchandise but contracted with a subcontractor to have the merchandise further processed, Commerce treated the subcontractor as the producer, s*ee Brass Sheet and Strip From the Netherlands: Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 51449, 51451 (Oct. 1, 1997), Commerce changed this practice in conjunction with the Uruguay Round Agreements Act of 1994. *See Proposed Rules,* 61 Fed. Reg. at 7330, 7381; *see also Notice of Final Determination of Sales at Less Than Fair Value: Polyvinyl Alcohol From Taiwan*, 61 Fed. Reg. 14064, 14070-71 (March 29, 1996). Under the revised practice, Commerce considers the party contracting for the tolling, rather than the processor or subcontractor, to be the producer of the subject merchandise. *See id.* Commerce stated that considering the producer of the subject merchandise to be the party controlling production and the ultimate sale was a more reasonable interpretation of the statute's intent. *See Brass Sheet*, 62 Fed. Reg. at 51451. The Court considers the proposed regulation and preamble to be a restatement of Commerce's existing practice toward subcontractors.

To determine if Commerce acted in accordance with law, the Court must consider whether Commerce's subcontractor practice is a reasonable interpretation of the statute. In making this determination, the Court "will give deference to [an agency's] longstanding . . . practice under a statute [the agency] is charged with administering." *Vivitar Corp. v. United States*, 593 F. Supp. 420, 433

(CIT 1984); *see also Zenith Radio Corp. v. United States*, 437 U.S. 443, 450 (1978).

Commerce's subcontractor practice applicable during the time in which Commerce considered

the determination at bar emphasizes ownership, control of relevant sale, and control of production of

the subject merchandise as primary points for Commerce's consideration when determining a

company's producer status. However, Commerce appears to be inconsistent with what it considers to

be the "relevant sale." Before determining whether Commerce's consideration of these factors is

reasonable, therefore, the Court needs clarification regarding what is meant by the "relevant sale."

Thus, the Court remands this matter to Commerce for clarification of the reasoning behind Commerce's

interpretation and application of its practice with regard to relevant sale.

A.      *Clarification of Relevant Sale*

Control of the "relevant sale" is a fundamental factor in Commerce's determination of producer

status under its subcontractor practice. The practice as stated in proposed regulation section

351.401(h) requires Commerce, when determining whether a subcontractor is a producer, to consider

who "control[s] the relevant sale," *i.e.*, who controls "the manner in which [the subject merchandise] is

ultimately sold." *Proposed Rules*, 61 Fed. Reg. at 7308, 7330.   However, the proposed rules

provide no definition or interpretation of relevant or ultimate sale. Also, the Court notes an absence of

administrative[15] and judicial precedent interpreting Commerce's practice under the statute.[16]

---

[15] In its litigation papers, Commerce cites to *Notice of Final Determination at Less Than Fair Value: Certain Forged Stainless Steel Flanges from India*, 58 Fed. Reg. 68853, 68855 (Dec.

Foundry sales are at issue in this matter.  The administrative record indicates that TSMC's

foundry sales involve two distinct sales transactions:  (1) the sale of subject merchandise by TSMC to

its design house customers and (2) the sale of subject merchandise by the design house to its

customers.[17]  In making its determination as to TSMC's producer status, Commerce interpreted the

"relevant sale" for purposes of its subcontractor practice to be the sale by the design house.  *See Final*

_____

29, 1993), to support is use of 19 U.S.C. § 1677b(e) (1994), the Court notes, however, that
determination was made prior to the changes in Commerce's subcontractor practice at issue in this
case.

   [16]  Pursuant to the Court's request, the parties in this matter provided additional briefing
material on the definition of "relevant sale."  TSMC argues the relevant sale is the sale by TSMC to its
unaffiliated design house customers.  TSMC cites as authority to support its position the antidumping
duty statute's export price definition which states, "the price at which the subject merchandise is first
sold . . . to an unaffiliated purchaser in the United States.  19 U.S.C. § 1677a(a) (1994)."
(Memorandum Responding to the Court's Questions During Oral Argument, at 3 n.2 (Oct. 4, 1999)
(Plaintiff's Response to Questions).)   Citing 19 U.S.C. § 1677b(e) (1994) -- Constructed Value,
Commerce defined relevant sale as the sales transaction which reflects all the essential costs of the
subject merchandise.  (*See* Defendant's Supplemental Memorandum, at 4 n.3 (Oct. 4, 1999)
(Defendant's Response to Questions).)  Commerce argues the sale by the foundry to the design house
does not reflect the cost of the design, therefore the transaction by the design house to its customers
captures more of the essential costs.  (*See id.* at 5.) Defendant-intervenor concurs with Commerce's
position.  (*See* Supplemental Submission of Micron Tech., Inc., at 3-4 (Oct. 4, 1999).)


   [17] The Court notes that both direct and indirect sales of SRAMs to the United States are at
issue in this matter.  (*See* Plaintiff's Response to Questions, at 7, 11 n.22; Foundry Elimination
Memorandum, at 7, 11 n.22 ("[TSMC] had . . . direct sales to the United States");  Respondent
Selection Memorandum, at 2 n.3.)  However, Commerce's preliminary and final determinations seem
only to address TSMC's indirect sales.  Commerce noted that in analyzing the relevant sale, it was
making a determination between "the sale from the foundry to the design house" and "the subsequent
downstream sale of the encapsulated SRAMs to the United States."  *Preliminary Determination*, 62
Fed. Reg. at 51444; *see also Final Determination*, 63 Fed. Reg. at 8918 (citing findings made in the
*Preliminary Determination*).   The Court will address the outstanding question concerning the status
of TSMC's direct sales in Section IV.B of this opinion.

*Determination*, 63 Fed. Reg. at 8918 n.4.  In the *Final Determination*, Commerce noted:

> TSMC considers the relevant sale to be its sale of SRAM wafers to its design house customers in the United States and Taiwan.  However, the Department preliminarily determined that the relevant sale in a foundry agreement is the ultimate sale of SRAMs made by the design house.

63 Feg. Reg. at 8918 n.4.  This definition of "relevant sale" was made, however, without stating why Commerce considers the relevant sale to be the sale of SRAMs by the design house.  In fact, Commerce itself, in its *Preliminary Determination* and Foundry Elimination Memorandum, seems unclear as to which sales transaction is the relevant sale.  In the Foundry Elimination Memorandum, Commerce found that a foundry did not control the relevant sale of the subject merchandise both because "[it] does not own the wafer design, [and ] it is not permitted to sell the processed wafer, to which it retains title, to anyone but the design house that provided the design" and, alternatively, because "[it] [does not] control the subsequent sale of the wafers (or further-processed SRAMs) by the design house."  (Foundry Elimination Memorandum, at 9-10.)  Commerce's first finding seems to implicate the sales transaction by the foundry to the design house and the second clearly refers to the sales transaction by the design house to its customers.

In the *Preliminary Determination,* both sales transactions again seem to be used in reference to Commerce's finding regarding control of the "relevant sale."  Commerce states, "[t]he foundry has no right to sell those wafers to any party other than the design house unless the design house fails to pay for the wafers" and it is the design house who "sells the encapsulated SRAMs to downstream customers."  *Preliminary Determination*, 62 Fed. Reg. at 51444.  Finally, Commerce found "the entity that controls and owns the SRAMs design, *i.e.*, the design house, controls the production, and

ultimate sale, of the subject merchandise." *Id.*

Citing Commerce's confusion about which transaction was the "relevant sale" and arguing it asserted control in both transactions, TSMC maintains the "relevant sale" for purposes of the proposed subcontractor regulation is that by it to its design house customers. TSMC contends Commerce's interpretation of "relevant sale" as that by the design house is counter to basic notions of contract law and taken to its logical conclusion would render Commerce's subcontractor regulation meaningless. TSMC argues Commerce's interpretation would mean a subcontractor normally could not satisfy section 351.401(h) because it would not control the relevant sale. TSMC contends this result is contrary to the proposed regulation which by its language, *i.e.* "[a] subcontractor will not be considered a manufacturer or producer when . . . ." contemplates the possibility that a subcontractor could be considered a producer under the antidumping statute. TSMC maintains Commerce's regulations should not be interpreted in a manner that would render them nugatory.

Commerce, in its papers before the Court, argues that its interpretation of the "relevant sale" as that by the design house is reasonable under the statute. Commerce supports its position by citing the manner in which constructed value is calculated under 19 U.S.C. § 1677b(e) (1994). In that calculation, Commerce must determine the "sum . . . of materials and fabrication or other processing of any kind employed in producing the merchandise." 19 U.S.C. § 1677b(e)(1). Commerce argues the "relevant sale" is that which captures all the costs of production, and since the foundry's sale price does not account for the cost of design or back end processing, the "relevant" sale is that by the design house.

In this case, Commerce appears to address on the record the aspect of TSMC's control with

regard to both sales transactions, however, it fails to address the basis for its designation of the sale by

the design house as the "relevant sale." *See Final Determination*, 63 Fed. Reg. at 8918; *Preliminary*

*Determination*, 62 Fed. Reg. at 51444; (Foundry Elimination Memorandum, at 9-11). In fact,

Commerce fails to state any reasoning behind its decision to treat the sale by the design house as the

"relevant sale." *See Final Determination*, 63 Fed. Reg. at 8918 n.4. The Court notes Commerce

relies on the definition of constructed value as a rational for its determination of "relevant sale" in its

papers submitted in opposition to the relief sought by the plaintiff. The Court notes further the

*Preliminary* and *Final Determinations* in this matter are devoid of such rational. Because "a

reviewing court must evaluate the validity of an agency decision on the basis of the reasoning presented

in the decision itself" and may not use "'post hoc rationalizations' of counsel [to] supplement or

supplant the rationale or reasoning of the agency," this Court will not consider Commerce's arguments

on this point presented in its litigation papers.[18] *Hoogovens Staal BV v. United States*, 86 F. Supp.

2d 1317, 1331 (CIT 2000) (quoting *FPC v. Texaco, Inc.*, 417 U.S. 380, 397 (1974)). This Court

remands this issue to Commerce with instructions to clarify its reasoning with regard to why it selected

the subsequent sale by the design house to be the "relevant sale" under the statute and its subcontractor

practice.

---

[18] On remand, if Commerce should cite the definition of constructed value as its reasoning for its selection of the sale by the design house as the "relevant sale," Commerce should also explain why use of constructed value is appropriate in this matter.

B.        *Clarification of Relevant Sale in the Context of TSMC's Indirect and Direct Sales*

The Court also notes confusion in the record regarding Commerce's interpretation and

application of its subcontractor practice to TSMC's indirect and direct sales.  The parties do not

appear to dispute that as a foundry TSMC sells subject merchandise to the United States market both

indirectly, *i.e.*, through design houses located in Taiwan who subsequently sell to the United States, and

directly, *i.e.*, to design house customers located in the United States.  (*See* Memorandum Responding

to the Court's Questions During Oral Argument, at 1; Foundry Elimination Memorandum, at 7, 11 n.22

("[TSMC] had . . . direct sales to the United States");  Respondent Selection Memorandum, at 2 n.3.)

Even though direct and indirect sales are recognized by Commerce in its internal memoranda regarding

the *SRAMs from Taiwan* investigation, the *Preliminary* and *Final Determinations* appear only to

address TSMC producer status with regard to indirect sales.


It is unclear to the Court whether Commerce analyzed TSMC's producer status with regard to

TSMC's direct sales.  Beyond Commerce's recognition of the existence of TSMC's direct sales, the

Court notes only a conclusory footnote regarding direct sales in Commerce's Respondent Elimination

Memorandum which stated because "TSMC acted solely as a foundry during the [Period of

Investigation]," it could not be considered a producer even with respect to its direct sales.  (Foundry

Elimination Memorandum, at 11 n.22.)  This conclusory statement lacks explanation.  Based on

Commerce's subcontractor practice, it is the Court's understanding that even if a company operates as

a foundry or subcontractor, Commerce must still determine whether the foundry is a producer by way

of determining ownership, control of production, and control of relevant sale.  *See Proposed Rules*, 61

Fed. Reg. at 7330, 7381. The Court notes the determination of "relevant sale" may vary if direct or

indirect sales are at issue. A company's identification as a foundry does not, in and of itself, seem to

determine its producer status under Commerce's subcontractor practice. The Court remands this

matter to Commerce for explanation and clarification of TSMC's producer status in the context of

direct sales.

**CONCLUSION**

At this time, the Court makes no determination whether Commerce's decision to exclude

TSMC is supported by substantial evidence or is otherwise in accordance with law, whether

Commerce's decision not to verify TSMC is supported by substantial evidence or is otherwise in

accordance with law or whether Commerce's actions violated the requirements of procedural fairness.

In accordance with this opinion, this matter is remanded to the United States Department of

Commerce. Commerce shall report its remand results within 45 days of the date of the remand order.

                                         _____

                                         Gregory W. Carman, Chief Judge

Dated: May 2, 2000
       New York, New York