Slip Op. 01-39

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE GREGORY W. CARMAN, CHIEF JUDGE

| | |
|---|---|
| TAIWAN SEMICONDUCTOR MANUFACTURING CO., LTD., | |
| **Plaintiffs,** | |
| v. | |
| UNITED STATES OF AMERICA, | Court No. 98-05-02184 |
| **Defendant,** | |
| and | |
| MICRON TECHNOLOGY, INC., | |
| **Defendant-Intervenor.** | |

Plaintiff, Taiwan Semiconductor Manufacturing Company, Ltd. (TSMC) has challenged the United States Department of Commerce's (Commerce) *Response to Court Remand Pursuant to Taiwan Semiconductor Manufacturing Company, Ltd., v. United States, Slip Op. 00-48* (Court Order, May 2, 2000) (*Remand Response*). Plaintiff's challenge is in furtherance of TSMC's original motion for Judgment Upon the Agency Record pursuant to Rule 56.2 of the Rules of this Court, challenging Commerce's final determination in the antidumping duty investigation excluding TSMC as a producer in *Notice of Final Determination of Sales at Less Than Fair Value: Static Random Access Memory Semiconductors From Taiwan*, 63 Fed. Reg. 8909 (Feb. 23, 1998) (*Final Determination*), as amended by *Notice of Amended Final Determination and Antidumping Duty Order of Sales at Less Than Fair Value: Static Random Access Memory Semiconductors From Taiwan*, 63 Fed. Reg. 18,883 (Apr. 16, 1998) (*Amended Final Determination*). Absent a response by Defendant, this Court has treated Defendant as being opposed to Plaintiff's challenge to Commerce's *Remand Response*.

Upon Plaintiff's challenge, and upon the opposition of Defendant and Defendant-Intervenor thereto, Plaintiff's motion is denied. The *Final Determination* of Commerce, as amended by the *Amended Final Determination* and *Remand Response*, is sustained in all respects. Plaintiff's motion for stay of further proceedings is denied. This case is dismissed.

Dated:  April 4, 2001

*White and Case LLP* (*Christopher F. Corr*, *Robert G. Gosselink*), Washington, D.C., for Plaintiff.

*Stuart E. Schiffer*, Deputy Assistant Attorney General of the United States; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Velta A. Melnbrencis*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Kenneth S. Kessler*, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Melanie A. Frank*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Counsel, for Defendant.

*Hale & Dorr LLP* (*Michael D. Esch*, *Gilbert B. Kaplan*, *Paul W. Jameson*, *Chris R. Revaz*), Washington, D.C., for Defendant-Intervenor.

**OPINION**

**CARMAN, Chief Judge:**  Upon Plaintiff's challenge to the *Remand Response* in furtherance of Plaintiff's original motion for Judgement Upon the Agency Record, and upon the opposition of the Defendant and Defendant-Intervenor thereto, Plaintiff's motion is denied, and this Court sustains in all respects Commerce's *Final Determination*, as amended by the *Amended Final Determination* and *Remand Response*.

BACKGROUND

Commerce initiated antidumping duty investigations regarding Static Random Access Memory Semiconductors (SRAMs) from the Republic of Korea and Taiwan for the period January 1, 1996, through December 31, 1996.  *See Initiations of Antidumping Duty Investigations: Static Random Access Memory From the Republic of Korea and Taiwan*, 62 Fed. Reg. 13,596 (March 21, 1997) (*SRAMs from Taiwan*).  On April 16, 1997, Commerce issued questionnaires to twenty-two companies thought to be producers or exporters of SRAMs in Taiwan.  Information from eighteen responding companies indicated a lack of administrative

resources to investigate all SRAM producers and exporters. Therefore, pursuant to 19 U.S.C. §

1677f-1(c)(2)(B) (1994),[1] Commerce limited the number of mandatory respondents (producers or

exporters under the statute) in the investigation. On May 21, 1997, Commerce selected five

companies as mandatory respondents in the investigation: Integrated Silicon Solutions, Inc.,

TSMC, Winbond Electronics Corporation, Alliance Semiconductor Corporation, and United

Microelectronics Corporation. (Memorandum of May 21, 1997, from the Team to Louis Apple,

Acting Director, Import Admin., Pl. Pub. Exh. 3, at 2 (Respondent Selection Memorandum).)

TSMC is the world's largest semiconductor foundry. In making its selection, Commerce

noted an apparent double counting of certain TSMC indirect sales to the United States and

questioned whether to attribute the sales to TSMC or to TSMC's design house customer for

whom TSMC manufactured the SRAM wafers. *See id*. at 2 n.3. The issue remained unresolved

as Commerce proceeded with its investigation. After TSMC filed its responses on June 16,

_____

[1]19 U.S.C. § 1677f-1(c)(2)(B) (1994) states, in pertinent part:

(c) Determination of dumping margin

. . .

(2) Exception

   If it is not practicable to make individual weighted average dumping margin
determinations under paragraph (1) [determining weighted average dumping
margins for every known exporter and producer of subject merchandise] because
of the large number of exporters or producers involved in the investigation or
review, the administering authority may determine the weighted average dumping
margins for a reasonable number of exporters or producers by limiting its
examination to

      . . .

      (B) exporters and producers accounting for the largest volume of the
      subject merchandise from the exporting country that can be reasonably
      examined.

1997, Commerce solicited supplemental information from TSMC regarding design and foundry roles in the SRAM production process and sale of merchandise.

In a September 23, 1997 memorandum, Commerce concluded that a foundry such as TSMC that manufactures processed SRAM wafers according to designs provided by a design house is not considered a producer under the statute because the design house has ultimate control over how the merchandise is produced and the manner in which it is ultimately sold. (Memorandum of September 23, 1997 from the Team to Louis Apple, Director, Import Admin., Pub. Doc. 346, Pl. Pub. Exh. 4, at 9, 11 (Foundry Elimination Memorandum).) On October 1, 1997, Commerce reversed its selection of TSMC as a mandatory respondent. *See Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Static Random Access Memory Semiconductors From Taiwan*, 62 Fed. Reg. 51,442, 51,444 (Oct. 1, 1997) (*Preliminary Determination*).

TSMC is considered a subcontractor. Therefore, in both the Foundry Elimination Memorandum and *Preliminary Determination*, Commerce applied its policy toward subcontractors or tollers as set forth in proposed regulation 19 C.F.R. § 351.401(h) and its preamble.[2] The proposed regulation states Commerce "will not consider a toller or subcontractor to be a manufacturer or producer where the toller or subcontractor does not acquire ownership, and does not control the relevant sale of the subject merchandise"; in addition, the preamble requires control of production. *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7308, 7330, 7381 (1996) (proposed Feb. 27, 1996) (codified at 19 C.F.R. pt. 351) (*Proposed Rules*).

---

[2] Proposed regulation 19 C.F.R. § 351.401(h) was finalized May 19, 1997. The final regulation excludes the preamble. *See Antidumping Duties; Countervailing Duties; Final Rule*, 62 Fed. Reg. 27,296 (May 19, 1997).

Commerce reasoned that because TSMC did not own the SRAM design, which imparts the essential features of the product, TSMC did not own, control the relevant sale of, or control the production of, the subject merchandise. *Preliminary Determination*, 62 Fed. Reg. at 51,444.

TSMC filed unsolicited comments with Commerce on October 14, 1997, justifying its standing as a producer respondent and requesting that Commerce reconsider its preliminary determination. On October 29, 1997, Commerce informed TSMC that it would not alter TSMC's non-producer status and would therefore not engage TSMC in the verification process. On February 23, 1998, Commerce reiterated its preliminary determination to exclude TSMC from the investigation in the *Final Determination*, as amended.

On May 15, 1998, TSMC moved for Judgment Upon the Agency Record challenging Commerce's exclusion of TSMC as a producer in its *Final Determination*, as amended. Among its contentions, TSMC argued a misapplication by Commerce of proposed regulation 19 C.F.R. § 351.401(h), contrary precedent, required verification, and violation of rules of procedural fairness.

On March 31, 1999, the United States Government (United States) opposed TSMC's motion. The United States argued that by not specifying the criteria for identifying a producer, Congress gave Commerce discretion to devise its own methodology. (Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment on the Agency Record at 26 (Def's Memo in Opposition).) The United States asserted Commerce exercised its discretion consistent with proposed regulation 19 C.F.R. § 351.401(h) and its preamble, and that substantial evidence on the record indicated the design house's ownership of the SRAMs design gave it control of the relevant sale of and control of production of the subject merchandise, while TSMC's non-

ownership of the design minimized its role in the production process. *See id*. at 29-31. The

United States argued that although section 351.401(h) properly guided Commerce, the proposed

regulation did not "address all circumstances in which a toller would not be deemed a producer."[3]

*Id*. at 35. The United States claimed that TSMC's legal title to the SRAM wafers lessened the

design house's risk of loss while TSMC processed the wafers, but it did not lessen the

significance of the design house's continuous ownership of the underlying intellectual property

rights. *Id*. at 39-40. The United States also claimed Commerce did not need to verify TSMC's

data once TSMC was no longer a selected respondent. *See id*. at 51. Finally, the United States

stated Commerce violated no requirements for procedural fairness because TSMC had ample

opportunity to explain why it should be considered a respondent, and Commerce may make

changes during an administrative proceeding to reach an accurate conclusion. *See id*. at 55-56.

On May 2, 2000, this Court remanded the *Final Determination*, as amended, to

Commerce to clarify: (1) its reasons for choosing sale by the design house as the "relevant sale";

and (2) its analysis, under its subcontractor practice, of TSMC's producer status in the context of

TSMC's direct sales to the United States. *See Taiwan Semiconductor Manufacturing Co. v.

United States*, 100 F.Supp. 2d 1109, 1125-1126 (Ct. Int'l Trade, 2000) (*Taiwan Semiconductor*).

A familiarity with this Court's opinion in *Taiwan Semiconductor* is presumed.

In its *Remand Response*, Commerce reiterated its reliance upon the proposed regulation

and its preamble. Commerce clarified its interpretation of "relevant sale," defining it as the "first

---

[3]For support, the United States pointed to a "totality of circumstances" standard
Commerce first applied after its final determination in the instance case. *See Taiwan
Semiconductor Manufacturing Co. v. United States*, 100 F.Supp. 2d 1109, 1120, fn.13 (Ct. Int'l
Trade, May 2, 2000) (*Taiwan Semiconductor*).

sale in the distribution chain by the company that is in a position to set the price of the product, and by doing so, to sell at less than fair value in or to the U.S. market." *Remand Response* at 7-8. Because the design house owns the design, its sale price represents the full value of the subject merchandise by including the value of both design and fabrication. *See id*. at 10. Commerce stressed the essential nature of design in this specific proceeding, noting that design determines the ultimate characteristics, performance, and purposes of the subject merchandise. *See id*. at 11. Commerce explained that by controlling how the foundry uses the design in production and the distribution to the marketplace of products incorporating the design, the design house directs production of the subject merchandise. *See id*. at 11.

Although Commerce acknowledged the significance of the fabrication performed by TSMC, it stated that TSMC's price does not reflect all relevant elements of value because the subcontractor only performs a segment of the manufacturing process, and this at the direction of another entity. *See id*. at 8-9. Commerce reasoned that because TSMC does not bear at least one element of cost essential to production, its price represents only a portion of the value of the subject merchandise. Commerce considered the transaction between TSMC and the design house to be a sale of inputs and services rather than a sale of subject merchandise. *See id*. at 9-10.

In keeping with this interpretation of "relevant sale," Commerce next rejected TSMC as a producer within the context of TSMC's direct sales to design houses in the United States because only the location of the producer distinguished TSMC's direct from indirect sales. *See id*. at 12. Commerce stated that in order to be a producer, the foundry must use its own designs or those licensed from another company; TSMC offered no evidence of operating differently for

contractors in the United States than it operated for contractors located in Taiwan. *See id*. at 13.

On July 11, 2000, in furtherance of Plaintiff's original 56.2 Motion, TSMC challenged Commerce's determination to exclude TSMC as a respondent producer in the underlying investigation. (Response of Taiwan Semiconductor Manufacturing Company, Ltd. to the Remand Views Submitted by the U.S. Department of Commerce to the Court on June 30, 2000 (Pl.'s Resp. to Remand).)

JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994). This Court will sustain Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1994). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

CONTENTIONS OF THE PARTIES

*A.      Plaintiff*

TSMC makes five criticisms of Commerce's *Remand Response*. First, TSMC contends that Commerce failed to meet its legal standard for determining that a subcontractor is not a manufacturer or producer under Section 351.401(h). (Pl.'s Resp. to Remand at 3.) According to TSMC, a subcontractor must satisfy two requirements in order to be considered a non-producer: (1) non-ownership of the subject merchandise; and (2) lack of control of the relevant sale of the subject merchandise. *See id*. at 3. TSMC claims that because it retains legal title to the subject

merchandise until its sale to the design house, TSMC fails to meet both requirements for non-producer status and must therefore be a producer. *See id*. at 3-4. Accordingly, TSMC asserts it need not prove control of relevant sale. *See id*. at 4.

Second, TSMC nonetheless claims to control the relevant sale, which it defines as the first sale of the subject merchandise to an unaffiliated person. *See id*. TSMC distinguishes customer payments made to TSMC pursuant to a sales contract from a contractor's payment of a service fee to a non-producer subcontractor. *See id*.

Third, TSMC claims Commerce's application of its "price setter" theory fails for four reasons: (1) by transferring title to the buyer for consideration, TSMC sold the subject merchandise itself rather than a mere service or input; (2) TSMC's decision to be bound by freely negotiated contract terms does not waive its control of sales; (3) no law or precedent requires the export price to support all elements of value; rather, in investigations involving custom-made products, Commerce has treated the entity that actually manufactured the product as the producer; and (4) it would create unsustainable precedent by requiring complex economic analysis of whether all cost elements "passed through" to the customer in the price, thus exposing Commerce to challenges that it treated the wrong company as producer and imposing an unpredictable standard upon exporters and importers as to the identity of a producer in a given investigation. *See id*. at 6-13.

Fourth, TSMC faults Commerce for labeling as temporary and partial TSMC's ownership of the subject merchandise, asserting a lack of evidence for Commerce's claim that TSMC takes title for indemnification purposes. *See id*. at 13-15. Because TSMC's sales contract covers the subject fabricated wafer, TSMC claims Commerce incorrectly characterized the sale as one of

inputs and services and that because TSMC owns the fabricated wafer entirely, Commerce incorrectly claimed partial ownership by the design house. *See id*.

Fifth, TSMC asserts Commerce did not adequately respond to the Court's request for clarification under the statute and existing practice. *See id*. at 15-16. TSMC criticizes Commerce for inadequately defending its formulation of "relevant sale" as the downstream sale by TSMC's customers and argues that under Commerce's formulation, a subcontractor could never qualify as a producer under 19 C.F.R. § 351.401(h), rendering the standard nugatory. *See id*.

B.     *Defendant-Intervenor*

Defendant-Intervenor contends: (1) Commerce fully responded to the Court's remand order; and (2) Commerce's *Remand Response*, by receiving approval from the lead official responsible for administering the antidumping laws at the Department of Commerce "represents the considered policy decision of the Department of Commerce." (Comments of Defendant-Intervenor Micron Technology, Inc. on Defendant's Response to Court Remand.)

C.     *Defendant*

Absent a response by Defendant, this Court treats Defendant as being opposed to Plaintiff's challenge to Commerce's *Remand Response*.

ANALYSIS

A.     *Commerce's interpretation of "producer" is based upon a reasonable construction of the antidumping statute.*

Commerce based its determination upon a reasonable construction of the antidumping

statute.  Because the statute lists no criteria by which to determine producer status,[4] the Court

must consider whether the agency's determination "is based on a permissible construction of the

statute."  *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843

(1984).  In doing so, the Court "need not conclude that the agency construction was the only one

it permissibly could have adopted to uphold the construction, or even the reading the court would

have reached if the question initially had arisen in a judicial proceeding."  *Id*. at 843 n.11.

Commerce's construction of the statute is found in proposed regulation 19 C.F.R.

§351.401(h) and its preamble, by which Commerce publicized its change of practice from

treating the subcontractor as producer to treating the contractor as producer.  *See Proposed Rules,*

61 Fed. Reg. at 7330, 7381; *see also Notice of Final Determination of Sales at Less Than Fair*

*Value: Polyvinyl Alcohol From Taiwan*, 61 Fed. Reg. 14,064, 14,070 (March 29, 1996).[5]

Proposed regulation 19 C.F.R. § 351.401(h) states: "The Secretary will not consider a toller or

subcontractor to be a manufacturer or producer where the toller or subcontractor does not acquire

ownership, and does not control the relevant sale, of the subject merchandise or foreign like

product."  *Proposed Rules*, 61 Fed. Reg. at 7381.  The preamble states:

New paragraph (h) deals with the Department's treatment of subprocessors or

---

[4]19 U.S.C. § 1677(28) (1994) simply defines "producer" as "the producer of the subject merchandise."

[5]Because the investigation of this matter began by petition filed in May, 1997, which is after January 1, 1995, but prior to June 18, 1997, the applicability date of 19 C.F.R. part 351, this Court will treat the proposed regulation and preamble as a "restatement of the Department's interpretation of the requirements of the Act as amended by the [Uruguay Round Agreements Act]." 19 C.F.R. § 351.701 (1998).  Although the regulation is not directly applicable to the instant investigation and this Court will not strictly construe its language and terms, it does "provide guidance." *See Brass Sheet and Strip From the Netherlands: Final Results of Antidumping Duty Administrative Review*, 62 Fed. Reg. 51,449, 51,451 (Oct. 1, 1997).

"tollers." Several commentators expressed support for the Department's recent decision that tolling operations (i.e., subcontractors) should not be treated as manufacturers or producers of the subject merchandise. The Department concurs with those commentators who urged that, because this policy has not been widely publicized, that it be enunciated in the regulations. Under paragraph (h), where a party owning the components of subject merchandise has a subcontractor manufacture or assemble that merchandise for a fee, the Department will consider the owner to be the manufacturer, because that party has ultimate control over how the merchandise is produced and the manner in which it is *ultimately* sold. The Department will not consider the subcontractor to be the manufacturer or producer, regardless of the proportion of production attributable to the subcontracted operation or the location of the subcontractor or owner of the goods.

*Id.* at 7330 (emphasis added).

Commerce's construction of "producer," as memorialized in the proposed regulation and preamble, emphasizes three factors: (1) ownership of the subject merchandise; (2) control of the relevant sale of the subject merchandise; and (3) control of production of the subject merchandise. To determine whether Commerce's consideration of these factors is reasonable, this Court remanded the matter to Commerce to clarify its reason for choosing the sale by the design house as the "relevant sale." *See Taiwan Semiconductor*, 100 F. Supp. 2d at 1122.

Commerce's *Remand Response* defines "relevant sale" as "the first sale in the distribution chain by the company that is in a position to set the price of the product, and by doing so, to sell at less than fair value in or to the U.S. market." *Remand Response* at 7-8. Because such a company's "pricing represents all relevant elements of value," it "functions as the 'price setter' or potential price discriminator" and is therefore the producer of the merchandise. *Id*. at 8.

Commerce's use of "relevant sale" to interpret "producer" is a reasonable construction of the statute because it furthers congressional intent for Commerce to determine whether subject merchandise is being, or is likely to be, sold in the United States at less than its fair value. *See* 19

U.S.C. § 1673d(a)(1) (1994). In order to make a less-than-fair-value determination, Commerce must first determine the exporter or producer of the subject merchandise who controls the export price (or constructed export price) that Commerce compares to normal values to determine dumping margins. *See* 19 U.S.C. § 1677f-1(c)(1) (1994). This Court agrees with Commerce that its interpretation of "producer" is consistent with section 772(a) and (b) of the Tariff Act of 1930, as amended, which defines "export price" and "constructed export price" as the price at which the subject merchandise is first sold (or agreed to be sold) by the producer or exporter of such merchandise to an unaffiliated purchaser in, or for exportation to, the United States. TSMC, in claiming an arm's length establishment of subject merchandise's price is the "only legal requirement for the use of sales in calculating dumping," ignores Commerce's need to determine the identity of the producer making the sale. (Pl.'s Resp. to Remand at 8.)

Neither will this Court label Commerce's "pass through" analysis unreasonable simply because TSMC claims its application too complex for future investigations. The elaborate analysis rejected by the Court of Appeals for the Federal Circuit in *Daewoo Electronics Co. v. International Union*, 6 F.3d 1511, 1518 (Fed Cir. 1993) is readily distinguishable. There, the lower court had rejected Commerce's reasonable use of the accounting method, requiring instead a more complicated econometric analysis of taxes passed through to home market consumers. Here, the Court does not impose a preferred definition of "relevant sale" upon Commerce that thwarts Commerce's reasonable consideration of control of all relevant elements of value to determine producer status. This Court will not decide the hypothetical cases raised by TSMC.

TSMC has also failed to persuade this Court that Commerce has unreasonably departed

from case precedent.  The cases it cites regarding custom-made products are inapposite.[6]

TSMC claims Commerce's definition of relevant sale renders the regulation nugatory

because, as the subcontractor cannot control the downstream sale by its purchaser, the

subcontractor can never qualify as producer.  Commerce, however, does not require the

subcontractor to control the downstream sales of its customers.  Its requirement of control over

all elements of value simply means here that the subcontractor's customer who owns the design,

rather than the subcontractor, controls all relevant elements of value.

TSMC also claims Commerce did not respond to the Court's request for clarification

under the statute and existing practice.  This Court has already noted an absence of

---

[6]TSMC attempts to support its claim that Commerce "routinely has granted manufacturer status to, and calculated individual margins for, producers that manufactured and sold custom-made products based on customer-provided designs and/or specifications" by citing to the following: *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et. al.*, 64 Fed. Reg. 35,590 (July 1, 1999) (lists custom-made specialty bearings under "products covered" with no discussion of whether bearing designer or bearing manufacturer should be considered the respondent); *Engineered Process Gas Turbo-Compressor Systems Whether Assembled or Unassembled, and Whether Complete or Incomplete, from Japan*, 62 Fed. Reg. 24,394, 24,406 (May 5, 1997) (in discussion of level of trade adjustment, "technical specification development" listed as U.S. selling expense in transaction between affiliated parties); *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.*, 62 Fed Reg. 2081 (Jan. 15, 1997) (lists custom-made specialty bearings under "products covered" with no discussion of whether bearing designer or bearing manufacturer should be considered the respondent); *Certain Corrosion Resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate from Canada*, 61 Fed. Reg. 51,891 (Oct. 4, 1996) (Canadian manufacturer's sales of custom-made products to end users and steel service centers a substantially similar selling activity warranting no level of trade adjustment); *Mechanical Transfer Presses from Japan*, 62 Fed. Reg. 11,820 (March 13, 1997) (discusses need for cost test on sale-by-sale basis for unique custom-built capital equipment); *Large Power Transformers from Japan*, 56 Fed. Reg. 29,215 (June 26, 1991) (pre-dates change of tolling practice). (Response of Taiwan Semiconductor Manufacturing Company, Ltd. to the Remand Views Submitted by the U.S. Department of Commerce to the Court on June 30, 2000 at 16 (Pl.'s Resp. to Remand).)  Of the cases decided after the proposed regulation, none revolve around the issue of producer identity.

administrative and judicial precedent interpreting Commerce's practice under the statute. *See*

*Taiwan Semiconductor*, 100 F. Supp. 2d at 1123. Commerce's remand response has, however,

through its further development of Commerce's reasoning behind the proposed regulation,

adequately demonstrated its interpretation of "relevant sale" is a reasonable construction of

"producer."

Ownership and control of production of the subject merchandise, the other two

components emphasized by the proposed regulation and preamble, also constitute a reasonable

construction of "producer." In considering ownership, Commerce reasonably considers whether

a party owns the components of the subject merchandise. The preamble states: "Where a party

*owning the components* of the subject merchandise has a subcontractor manufacture or assemble

that merchandise for a fee, the Department will consider the owner to be the manufacturer . . . ."

61 Fed. Reg at 7330 (emphasis added). TSMC focuses only upon the language of proposed

regulation 19 C.F.R. § 351.401(h) to argue that ownership of the subject merchandise

automatically renders a subcontractor a producer. *See Proposed Rules*, 61 Fed. Reg. at 7381

("The Secretary will not consider a . . . subcontractor to be a . . . producer where the . . .

subcontractor does not acquire ownership, and does not control the relevant sale, of the subject

merchandise . . . ."). This Court finds Commerce has reasonably considered ownership of the

components of the subject merchandise as a factor in its construction of "producer." Control of

production of the subject merchandise, the other factor emphasized by the proposed regulation

and preamble, also constitutes a reasonable construction of "producer."

B.      *Commerce's determination is supported by substantial evidence on the record.*

Commerce's determination that TSMC is not a producer of the subject merchandise is

supported by substantial evidence on the record showing that TSMC does not own, control the

relevant sale of, or control production of, the subject merchandise. TSMC's non-ownership of

the wafer design constitutes the determinative factor in Commerce's and this Court's analysis.

First, TSMC's non-ownership of the design negates its claim of ownership of the subject

merchandise. On its face, TSMC appears to own the subject merchandise because it holds title to

the wafers sold to the design house.[7] Commerce, however, correctly notes that although TSMC

delivers to the design house a product with all the characteristics of the subject merchandise, its

price represents only the cost of transferring another company's design into the actual product.

*See Remand Response* at 5, 9. The record demonstrates the design house owns the underlying

intellectual property at all stages of production; therefore, only upon TSMC's transfer to the

design house does one party own all components of the subject merchandise.

Second, TSMC's non-ownership of the design means it cannot control the relevant sale of

the subject merchandise. Because TSMC's price does not reflect all relevant elements of value,

it cannot function as the price-setter for purposes of a dumping investigation. Substantial

evidence on the record supports Commerce's position that, "in an industry that is shaped by

intellectual property considerations[,] . . . design is one of the primary determinants of the value

of individual products." *Id*. at 11. In its Foundry Elimination Memorandum, Commerce quotes

United Microelectronics Corporation, a foundry with processes similar to those of TSMC:

> In the foundry business, UMC starts with blank wafers, and processes them in
> foundry operations according to instructions and using designs created, owned and
> provided by a design house or customer. These designs determine the type,
> function and features of the resulting integrated circuit or IC. [The foundry]

---

[7]TSMC correctly asserts its purpose for holding title is irrelevant, despite Commerce's
assumption that TSMC holds title merely to indemnify against loss.

simply performs foundry operations (i.e., depositing layers, forming patterns, etching, implanting into and treating the wafers) to produce a finished wafer incorporating the customer's specific designs.

(Foundry Elimination Memorandum at 7-8.)  Because TSMC  "normally sells its . . . SRAM . . . processed wafers to customers who supply their own designs," TSMC's customers control the relevant sale of the subject merchandise.  (Response of Taiwan Semiconductor Manufacturing Company Ltd. of May 14, 1997 to Section A of Commerce's Questionnaire, Pub. Doc. 131 (excerpts), Pl. Pub. Exh. 2, at A-1.)

Finally, by owning the design, the design house controls production of the subject merchandise.  From information provided by respondents, Commerce concluded "the entity controlling the wafer design in effect controls production in the SRAMs industry" because the design house: (1) produces, or arranges and pays for the production of, the design mask; (2) retains ownership of the design and design mask at all stages of production; (3) subcontracts production with a foundry, telling the foundry what and how much to make; and (4) arranges for subsequent steps in the production process after taking possession of the processed wafers. (Foundry Elimination Memorandum at 9.)

*C.  Commerce's decision not to verify the information submitted by TSMC is supported by substantial evidence and otherwise in accordance with law.[8]*

Because TSMC is not a producer and thus cannot be a respondent, Commerce should not be required to verify the information submitted by TSMC.  Although 19 U.S.C. § 1677m(i)(1994) states Commerce "shall verify all information relied upon in making . . . a final determination in an investigation" and this is echoed by the implementing regulation applicable

---

[8]The parties arguments regarding verification and procedural fairness are summarized in *Taiwan Semiconductor*, 100 F.Supp. 2d at 1115, 1116, 1118.

at the time,[9] a subsequent provision of the regulation states:

> If the Secretary decides that, because of the large number of producers and resellers included in an investigation or administrative review, it is impractical to verify relevant factual information for each person, the Secretary may select and verify a sample.

19 C.F.R. § 353.36(a)(2). Requiring verification would defeat the legislative intent behind 19 U.S.C. § 1677f-1(c)(2) (1994), which allows Commerce to limit the number of mandatory respondents when an investigation involves an unmanageable number of producers. Verification of information from each potential respondent would undermine statutory and regulatory concern for conservation of scarce administrative resources. ( Defendant's Opposition to Motion for Judgment on Agency Record at 51-52.)

Furthermore, verification would not change TSMC's status. This Court has found substantial evidence on the record to support Commerce's determination to exclude TSMC as a mandatory respondent. Were Commerce to resolve the factual discrepancies alleged by TSMC in TSMC's favor, the foundry would remain a non-producer. Commerce's decision not to verify the information submitted by TSMC is supported by substantial evidence and otherwise in accordance with law.

*D. Commerce did not violate legal rules of procedural fairness.*

Commerce did not violate legal rules of procedural fairness when its *Preliminary Determination* announced Commerce would no longer consider TSMC a mandatory respondent despite contradicting Commerce's earlier statement that TSMC would be a mandatory respondent throughout the investigation. (Respondent Selection Memorandum at 2 n.3.) In

---

[9]"The Secretary will verify all factual information the Secretary relies on in [a] final determination . . . ." 19 C.F.R. § 353.36(a)(1)(i) (1997).

reviewing an agency's change of position, the Court will consider whether the action was arbitrary. *See Cultivos Miramonte S.A. v. United States*, 980 F.Supp. 1268, 1274, n.7 (Ct. Int'l Trade, 1997).

Commerce's action was not arbitrary. The context within which it named TSMC a mandatory respondent also indicated the need to resolve a double counting discrepancy. Commerce warned that indirect sales to the United States by TSMC could instead be analyzed as direct sales to the United States by TSMC's design house customers. (Memorandum of May 21, 1997, from the Team to Louis Apple, Acting Director, Import Admin., Confidential Def. Exh. 1 at 2 n.3.) As explained in the Foundry Elimination Memorandum, Commerce originally believed TSMC "had a sufficient volume of sales to the United States to select [it] as [a respondent] independent of any finding related to [its] foundry business." (Foundry Elimination Memorandum at 2 n.4). Subsequent review of TSMC's responses, however, indicated no non-foundry-related sales by TSMC during the period of investigation. *Id*.

In order to reach an accurate conclusion in the final determination, therefore, Commerce could no longer treat TSMC as a mandatory respondent. Through the *Preliminary Determination* Commerce gave TSMC adequate opportunity to comment on its decision. Commerce did not arbitrarily change its position in excluding TSMC as a mandatory respondent.

CONCLUSION

Upon Plaintiff's challenge to Commerce's exclusion of TSMC as a producer in the *Final Determination,* as amended by the *Amended Final Determination* and *Remand Response,* and upon the opposition to Defendant and Defendant-Intervenor thereto, the *Final Determination* of Commerce, as amended by the *Amended Final Determination* and *Remand Response,* is sustained in all respects.   Plaintiff's motion for stay of further proceedings is denied.

_____
Gregory W. Carman
Chief Judge

Dated: April 4, 2001
New York, New York